ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| FRANCISCO ALVARADO VARGAS, CARMEN I. VEGA COLÓN, LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR AMBOS, Y HAYDELIS ALVARADO VEGA<br><br>Parte Apelada<br><br><br>v.<br><br><br>**DR. LUIS A TARRATS ORTOLOZA (T/C/C) LUISAM TARRATS**, SU ESPOSA JANE DOE Y LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR AMBOS, DR. JAIME DIAZ BORGES, SU ESPOSA JANE DOE Y LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR AMBOS, EL ANESTESISTA GABRIEL ORTIZ RODRIGUEZ, ET AL.<br><br>Parte Apelante | KLAN202500303 | *Apelación,* procedente del Tribunal de Primera Instancia, Sala Superior de Caguas<br><br>Sala: 702<br><br><br>Caso Núm.: GM2019CV00735<br><br><br><br>Sobre:<br><br>Daños y perjuicios |

Panel integrado por su presidenta, la Jueza Grana Martínez[1], el Juez Salgado Schwarz y el Juez Monge Gómez.

Monge Gómez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 22 de julio de 2025.

Compareció ante este Tribunal la parte apelante, el Dr. Luis A. Tarrats Ortolaza (en adelante, el "Dr. Tarrats Ortolaza" o "Apelante"), mediante recurso de apelación presentado el 9 de abril de 2025. Nos solicitó la revocación de la *Sentencia* emitida y notificada por el Tribunal de Primera Instancia, Sala Superior de Caguas (en adelante, el "TPI"), el 22 de enero de 2025. A través de dicho dictamen, el TPI declaró "Ha Lugar" la "**Demanda**" incoada en contra del Dr. Tarrats Ortolaza.

---

[1] De conformidad con la Orden Administrativa OATA-2025-068 del 3 de junio de 2025, se designó a la Hon. Grace Grana Martínez en sustitución del Hon. Félix R. Figueroa Cabán, quien se acogió al retiro el 6 de mayo de 2025 y cesó funciones como Juez de Apelaciones.

Por los fundamentos que expondremos a continuación, se *confirma* la *Sentencia* apelada.

**I.**

El caso de epígrafe tuvo su origen el 6 de septiembre de 2019, con la presentación de una "**Demanda**" sobre daños y perjuicios por impericia médica por parte del Sr. Francisco Alvarado Vargas (en adelante, el "señor Alvarado Vargas"), su esposa Carmen I. Vega Colón (en adelante, la "señora Vega Colón"), la sociedad legal de gananciales compuesta por ambos, y su hija, Haydelis Alvarado Vega (en adelante, "Alvarado Vega") (en adelante y en conjunto, los "Apelados"), en contra del Dr. Tarrats Ortolaza, el anestesista Gabriel Ortiz Rodríguez (en adelante, "Ortiz Rodríguez"), el Dr. Jaime Díaz Borges (en adelante, "Dr. Díaz Borges"), sus respectivas sociedades legales de gananciales, el Hospital Menonita de Cayey y varias compañías aseguradoras de nombres desconocidos. Mediante la misma, alegaron que, el 6 de septiembre de 2018, el Dr. Tarrats Ortolaza realizó una cirugía endoscópica de los senos paranasales al señor Alvarado Vargas para tratarle sinusitis y apnea obstructiva del sueño. Indicaron que, durante dicho procedimiento, el Dr. Tarrats Ortolaza cortó de manera negligente el "endotracheal tube cuff", provocando una fuga masiva de oxígeno. Manifestaron que el anestesista Ortiz Rodríguez no apagó el suministro de oxígeno como era requerido, lo cual permitió que el gas continuara escapando descontroladamente.

Expresaron que el Dr. Díaz Borges, quien administró la anestesia, no se encontraba presente en la sala de operaciones al momento de los hechos, a pesar de que se trataba de un procedimiento de alto riesgo de incendio. Arguyeron que la combinación del oxígeno con la corriente eléctrica utilizada durante la intervención provocó un incendio en la cavidad oral del paciente, quien se encontraba sedado, lo que le causó quemaduras de segundo grado y fractura dental al ser apagado el fuego por el propio Dr. Tarrats Ortolaza. Adujeron que el señor Alvarado Vargas fue hospitalizado por dieciocho (18) días, incluyendo cinco (5) en intensivo, y que el cuidado recibido fue deficiente y por debajo del estándar requerido. Sostuvieron que, aunque las quemaduras requerían tratamiento diario, sólo fueron atendidas en una ocasión, lo que provocó una infección severa.

Indicaron que, pese a esto, el señor Alvarado Vargas fue dado de alta el 10 de septiembre de 2018, aún con síntomas de fiebre e infección y sin la debida prescripción de antibióticos.

De igual manera, relataron que el señor Alvarado Vargas tuvo que ser reingresado al hospital tres (3) días más tarde, donde fue diagnosticado con deshidratación, disfagia y cándida esofágica. Expresaron que no podía alimentarse adecuadamente y perdió peso de forma drástica. Señalaron que éste experimentó alteraciones permanentes en el gusto, dificultad para pronunciar ciertos sonidos y requirió terapia del habla. Explicaron, además, que tuvo que someterse a procedimientos odontológicos por la fractura y posterior pérdida de varios dientes frontales.

Indicaron que la señora Vega Colón se ausentó de su trabajo sin paga para cuidar a su esposo, sufriendo a su vez un fuerte deterioro emocional. Manifestaron que su hija, Alvarado Vega, también se vio gravemente afectada por la ausencia de sus padres y por la condición de su progenitor. Expresaron que tanto el señor Alvarado Vargas como la señora Vega Colón requirieron tratamiento psicológico. Sostuvieron que la situación afectó la estabilidad emocional y económica del núcleo familiar. En vista de lo anterior, le reclamaron al TPI lo siguiente: (1) $750,000.00 por los daños físicos del señor Alvarado Vargas, (2) $300,000.00 por el sufrimiento mental del señor Alvarado Vargas, (3) $100,000.00 por los daños emocionales a la señora Vega Colón, (4) $20,000.00 por los sufrimientos emocionales de su hija, Alvarado Vega, (5) $20,000.00 por concepto de lucro cesante y (6) $10,000.00 por gastos médicos. Igualmente, solicitaron la imposición de costas, honorarios de abogados e intereses legales. Dicha "**Demanda**" fue enmendada a los fines de incluir como codemandado al enfermero anestesista, Miguel Sáez Santiago (en adelante, "Saez Santiago"), así como para ampliar y detallar las alegaciones de impericia médica y los daños sufridos por los Apelados como consecuencia del procedimiento quirúrgico practicado al señor Alvarado Vargas.

Así las cosas, el 25 de febrero de 2020, el Hospital General Menonita presentó su "**Contestación a la Demanda Enmendada**", mediante la cual negó la mayoría de las alegaciones formuladas en su contra y señaló que, aunque el

Dr. Tarrats Ortolaza participó en el procedimiento quirúrgico practicado al señor Alvarado Vargas, el tratamiento, cuidado y atención médica ofrecidos en sus instalaciones fueron adecuados y conformes con el estándar exigido por la profesión médica. Manifestó que, tanto el señor Ortiz Rodríguez como el señor Sáez Santiago, quienes laboraban en el hospital al momento de los hechos, actuaron conforme a su formación médica y no incurrieron en conducta negligente.

Sostuvo, también, que el cuidado provisto cumplió con las exigencias profesionales generalmente aceptadas, a la luz del conocimiento médico disponible y de las prácticas prevalecientes en la medicina. Expresó que no existe relación causal entre los daños alegados por los Apelados y los servicios prestados en la institución médica objeto de esta controversia. Adujo que los doctores Tarrats Ortolaza y Díaz Borges no eran empleados del hospital, razón por la cual no procedía imponerle responsabilidad vicaria. Señaló que los daños reclamados se debieron a la conducta de terceros o a condiciones preexistentes no imputables al hospital. Indicó que los montos solicitados por los Apelados son excesivos y desproporcionados, y que, además, éstos no mitigaron adecuadamente los daños. Añadió que no concurren los elementos para imponer responsabilidad solidaria ni resulta aplicable la doctrina de autoridad aparente. En armonía con lo anterior, solicitó que se declarara "No Ha Lugar" la "**Demanda**" en su contra, con la correspondiente imposición de costas, gastos y honorarios de abogado.

Posteriormente, el 27 de febrero de 2020, el Dr. Tarrats Ortolaza presentó su "**Contestación a la Demanda Enmendada**", en la que, al igual que el Hospital Menonita, rechazó la mayoría de las alegaciones presentadas en su contra, especialmente aquellas relacionadas a imputaciones de impericia médica. Asimismo, alegó que el procedimiento quirúrgico realizado al señor Alvarado Vargas fue conducido conforme a los estándares profesionales vigentes y que su intervención se ejecutó con la debida pericia y cuidado. Sostuvo que en ningún momento incurrió en conducta negligente, ni en omisiones contrarias al deber médico. Aclaró que el señor Alvarado Vargas tenía un sangrado masivo por la amígdala derecha, por lo que era necesario cauterizar el lugar del sangrado para controlarlo. Manifestó que los daños reclamados por los Apelados no son

atribuibles a su gestión médica y que cualquier consecuencia adversa experimentada por el paciente fue resultado de factores ajenos a su intervención. Expresó que no existió relación causal entre sus actos y los daños presuntamente sufridos.

De igual manera, manifestó que los montos reclamados eran excesivos y no guardaban correspondencia con la realidad fáctica de los hechos. Señaló que el paciente fue debidamente atendido durante y después del procedimiento, conforme a los protocolos médicos establecidos. Indicó, además, que en el presente caso no concurrían los elementos necesarios para establecer responsabilidad civil alguna. En vista de lo anterior, le peticionó al Tribunal que declarara "No Ha Lugar" la "**Demanda Enmendada**".

Posteriormente, el 9 de marzo de 2020, el Dr. Díaz Borges presentó su "**Contestación a la Demanda Enmendada**", a través de la cual negó de forma expresa la mayoría de las alegaciones formuladas en su contra y alegó que, en todo momento, su intervención profesional con el señor Alvarado Vargas se llevó a cabo con un grado razonable de cuidado, conforme a las prácticas prevalecientes en la medicina y a los estándares generalmente reconocidos por la profesión médica para la condición clínica que éste presentaba al momento de su tratamiento. Manifestó que el tratamiento anestésico ofrecido fue apropiado y que le cobija la presunción de corrección profesional, correspondiéndole a los Apelados la carga de rebatirla mediante prueba pericial directa. Reiteró que actuó de forma diligente, prudente y razonable, por lo que no incurrió en conducta negligente ni en omisiones que generaran responsabilidad civil extracontractual.

Igualmente, sostuvo que no existe nexo causal entre su intervención médica y los daños reclamados por los Apelados. Expresó que, de haber ocurrido perjuicio alguno, éste no fue resultado de su actuación, sino que debiera atribuirse a terceros por los cuales no responde. Arguyó que los daños reclamados son especulativos, exagerados, desproporcionados y que algunos de ellos son preexistentes y no guardaban relación con el tratamiento médico brindado por su parte. Alegó, además, que los Apelados no mitigaron adecuadamente los daños reclamados y que la "**Demanda**" estaba total o parcialmente prescrita. Por último, negó toda imputación de solidaridad con los demás codemandados y solicitó que

se desestimaran las reclamaciones en su contra, con la correspondiente imposición de costas, gastos y honorarios de abogado.

Más adelante, el 23 de noviembre de 2020, el señor Sáez Santiago presentó su "**Contestación a la Demanda Enmendada**", mediante la cual rechazó las imputaciones formuladas en su contra por los Apelados. Afirmó haber desempeñado sus funciones como anestesista conforme al deber de cuidado exigido por la práctica médica, actuando con la destreza y diligencia requerida por la normativa profesional vigente. Asimismo, negó que su participación haya sido causa, directa o indirecta, de los daños reclamados en la "**Demanda Enmendada**". Sostuvo que, en caso de haberse producido algún menoscabo, el mismo no le resultaba imputable, toda vez que no incurrió en omisión, imprudencia ni desviación alguna del estándar legal aplicable. Argumentó que no procedía atribuirle responsabilidad civil ni imponerles obligación solidaria junto a los demás codemandados. Finalmente, sostuvo que no le asistía a los Apelados derecho alguno a la indemnización reclamada, por lo que solicitó la desestimación de las causas de acción incoadas, así como la imposición de costas, gastos y honorarios de abogado.

Tras múltiples trámites procesales, incluyendo la conclusión del proceso de descubrimiento de prueba, el 18 de septiembre de 2023 las partes presentaron el correspondiente *Informe de Conferencia Preliminar entre Abogados* y, el 26 de septiembre de 2023, se celebró la Conferencia con Antelación al Juicio. La vista en su fondo se llevó a cabo los días 22 al 26 de abril de 2024, continuando los días 29 y 30 de abril del mismo año, así como el 1 y 2 de mayo de 2024.

Por parte de los Apelados, ofrecieron testimonio el señor Alvarado Vargas y la señora Vega Colón, así como los peritos Dr. José Ortiz Feliciano (en adelante, "Dr. Ortiz Feliciano"), el psiquiatra Dr. Carlos J. Bacó Alfaro (en adelante, Dr. Bacó Alfaro"), el odontólogo Dr. Omar Rivera López (en adelante, "Dr. Rivera López") y la señora María Isabel Bayas, quien compareció como custodio de ciertos documentos relacionados con el historial laboral del señor Alvarado Vargas en la empresa Baxter. En representación del Apelante, prestó testimonio el propio Dr. Tarrats Ortolaza y presentó como testigos a los peritos, Dr. Charles Juarbe Santos (en adelante, "Dr. Juarbe Santos") y al Dr. Juan Portela Arraiza (en adelante, "Dr.

Portela Arraiza"). Por su parte, el Dr. Díaz Borges ofreció su testimonio y presentó como testigo pericial al anestesiólogo, Dr. Miguel Marrero Rivera.

Una vez finalizada la presentación de la prueba por parte de los Apelados, los codemandados Hospital Menonita, Ortiz Rodríguez, Sáez Santiago, el Dr. Díaz Borges y el Dr. Tarrats Ortolaza presentaron sendas *Mociones de Desestimación*, al amparo de la Regla 39.2(c) de Procedimiento Civil, 32 LPRA, Ap. V, R. 39.2 (c). Mediante *Sentencia Parcial* del 29 de abril de 2024, el TPI declaró "No Ha Lugar" dichas solicitudes, salvo en cuanto al Hospital Menonita, el Sr. Ortiz Rodríguez y el Sr. Sáez Santiago, las cuales declaró "Ha Lugar". En consecuencia, el procedimiento judicial continuó únicamente contra los codemandados restantes.

Finalmente, el 22 de enero de 2025, el TPI dictó *Sentencia* mediante la cual declaró "Con Lugar" la "**Demanda Enmendada**" y ordenó al Dr. Tarrats Ortolaza al pago de la suma total de $201,750.00 como compensación por los daños sufridos. Específicamente, el foro *a quo* valoró los daños físicos del señor Alvarado Vargas en $150,000.00 y sus angustias y sufrimientos mentales en $35,000.00. De igual manera, reconoció la suma de $10,000.00 por concepto de daños emocionales a favor de la señora Vega Colón y la cantidad de $5,000.00 por el mismo concepto a favor de su hija, Alvarado Vega. Además, se concedió la suma de $1,750.00 por los gastos asociados a la reparación de un diente fracturado. En cuanto a las causas de acción dirigidas contra el Dr. Díaz Borges, el TPI las declaró "No Ha Lugar".

Inconforme con lo anteriormente resuelto, el Apelante presentó el recurso de apelación que nos ocupa, mediante el cual le imputo al TPI la comisión de los siguientes errores:

> **PRIMER ERROR SEÑALADO: INCIDIÓ EN ERROR EL HONORABLE TRIBUNAL, DE INSTANCIA AL NO EMITIR E INCLUIR DETERMINACIONES DE HECHOS CONFORME A LA PRUEBA TESTIFICAL DOCUMENTAL Y PERICIAL PRESENTADA POR LA PARTE DEMANDADA-APELANTE, ASÍ COMO QUE INCIDIÓ EN CRASO ERROR EN LA APRECIACION DE LA PRUEBA DEL CASO Y AL DESCARTAR LA EVIDENCIA PERICIAL MAS ROBUSTA AL RESOLVER LOS HECHOS DE ESTE CASO.**

> **SEGUNDO ERROR SEÑALADO: INCIDIÓ EN ERROR EL HONORABLE TRIBUNAL DE INSTANCIA AL IMPONER UNA SENTENCIA SIN BASE EN LA PRUEBA TESTIFICAL, DOCUMENTAL Y PERICIAL RECIBIDA Y CONTRARIA AL ESTADO DE DERECHO IMPERANTE EN PUERTO RICO, Y AL**

**RESOLVER EL CASO BAJO LA DOCTRINA DE RES IPSA LOQUITUR, DOCTRINA QUE NO APLICA EN PUERTO RICO.**

El 7 de julio de 2025, los Apelados presentaron su "**Alegato de la Parte Apelada**".

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

**II.**

**A.**[2]

Dispone el Artículo 1802 del Código Civil de 1930, en su parte pertinente, que "[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado." 31 LPRA sec. 5141. En otras palabras, los actos y las omisiones en las que cualquier género de culpa o negligencia intervenga son fuentes de obligaciones que generan responsabilidad extracontractual. Cruz Flores *et al.* v. Hosp. Ryder *et al.*, 210 DPR 465, 483 (2022).

En cuanto a este precepto y su aplicación, se ha establecido que sólo procede la reparación de un daño cuando se demuestren los siguientes elementos indispensables: (1) el acto u omisión culposa o negligente; (2) la relación causal entre el acto u omisión culposa o negligente y el daño ocasionado; y (3) el daño real causado al reclamante. Nieves Díaz v. González Massas, 178 DPR 820, 843 (2010).

En particular, el concepto de daños ha sido definido como "todo menoscabo material o moral causado contraviniendo una norma jurídica, que sufre una persona y del cual haya de responder otra". López v. Porrata Doria, 169 DPR 135, 151 (2006). En esa misma línea doctrinal, se ha establecido que la culpa o negligencia es la falta del debido cuidado que consiste en no anticipar y prever las consecuencias racionales de un acto, o la omisión de un acto, que una persona prudente y razonable habría previsto en las mismas circunstancias. Cruz Flores *et al.* v. Hosp. Ryder *et al.*, *supra*, pág. 484; Nieves Díaz v. González Massas,

---

[2] Somos conscientes de que la Ley Núm. 55-2020, conocida como el Código Civil de 2020, derogó el Código Civil de 1930. Sin embargo, el Artículo 1815 del Código Civil de 2020 dispone lo siguiente: "La responsabilidad extracontractual, tanto en su extensión como su naturaleza, se determina por la ley vigente en el momento en que ocurrió el acto u omisión que da lugar a dicha responsabilidad". 31 LPRA sec. 11720. Por tanto, a la luz de lo anterior, las disposiciones aplicables al caso de autos son aquellas contenidas en el Código Civil derogado, puesto que los hechos por los cuales se reclaman los daños ocurrieron en septiembre de 2018.

*supra*, pág. 844; Rivera v. S.L.G. Díaz, 165 DPR 408, 421 (2005); Toro Aponte v. E.L.A., 142 DPR 464, 473 (1997).

Respecto a la relación causal, ésta es un componente imprescindible en una reclamación en daños y perjuicios, ya que "es un elemento del acto ilícito que vincula al daño directamente con el hecho antijurídico." Rivera v. S.L.G. Díaz, *supra*, pág. 422. Del daño culposo o negligente surge el deber de indemnizar que "presupone nexo causal entre el daño y el hecho que lo origina, pues sólo se han de indemnizar los daños que constituyen una consecuencia del hecho que obliga a la indemnización". López v. Porrata Doria, *supra*, pág. 151.

A la luz de lo anterior, para que prospere una acción en daños en nuestra jurisdicción, es preciso que el demandante demuestre, por preponderancia de la prueba, la realidad del daño sufrido, la existencia de un acto culposo u omisión negligente y, además, el elemento de causalidad. Art. 1802 del Código Civil, *supra*. La suficiencia, contundencia o tipo de prueba presentada, así como el valor que los tribunales le darán, dependerá, naturalmente, de las circunstancias particulares de cada caso, de conformidad con nuestro derecho probatorio. Sin embargo, la prueba presentada deberá demostrar que el daño sufrido se debió con mayores probabilidades a la negligencia que el demandante imputa. Se requiere, además, que la relación de causalidad entre el daño sufrido y el acto negligente no se establezca a base de una mera especulación o conjetura. Castro Ortiz v. Mun. de Carolina, 134 DPR 783, 793 (1993).

En lo que concierne a la responsabilidad civil extracontractual derivada de actos de mala praxis médica por causa de impericia o negligencia del profesional de la salud, nuestro más alto foro judicial ha establecido que recae sobre los médicos un deber jurídico de cuidado. Dicho deber exige que el galeno proporcione a sus pacientes una atención médica conforme a los conocimientos científicos y técnicos vigentes, teniendo en cuenta los avances contemporáneos en los medios de comunicación y enseñanza, así como las prácticas aceptadas por la comunidad médica, todo ello de acuerdo con los estándares generalmente reconocidos por la profesión. López v. Dr. Cañizares, 163 DPR 119, 132 (2004).

Por otra parte, al analizar un caso de esta índole, debe tenerse siempre presente que existe una presunción a favor del médico en cuanto a que actuó con

un grado razonable de cuidado y brindó un tratamiento adecuado. Arrieta v. De la Vega, 165 DPR 538, 549 (2005). *Véase*, López v. Cañizares, *supra*, pág. 134; Rodríguez Crespo v. Hernández, 121 DPR 639 (1988). En consecuencia, corresponde al demandante la carga de probar que el médico incurrió en negligencia y que dicha conducta constituyó, con el mayor grado de probabilidad, la causa del daño alegado, a los fines de desvirtuar dicha presunción. Rivera v. E.L.A., 99 DPR 890, 899 (1971).

En línea con lo anterior, es menester aclarar que la presunción que cobija a los galenos debe ser rebatida con prueba pericial. López v. Cañizares, *supra*, pág. 133. En este contexto, el estándar probatorio exigido resulta ser más estricto que el requerido en una acción ordinaria de daños y perjuicios al amparo del Artículo 1802 del Código Civil, *supra*, ya que la prueba pericial constituye un elemento sumamente relevante, aunque no concluyente. Cirino Vizcarrondo v. Clínica Gubern, 129 DPR 977, 1003 (1992). Finalmente, conforme a la normativa legal vigente, para establecer un caso prima facie de impericia médica se tiene que presentar prueba pericial sobre: (1) las normas mínimas de conocimiento y diligencia médica aplicables al médico generalista o al especialista según corresponda; (2) que el demandado incumplió dichas normas en el tratamiento ofrecido; y (3) que tal incumplimiento fue la causa de la lesión alegada por el paciente. López v. Cañizares, *supra*, pág. 134; Rodríguez Crespo v. Hernández, *supra*, págs. 650.

**B.**

En nuestro ordenamiento jurídico, "la obligación de reparar daños generalmente dimana de un hecho propio". Vélez Colón v. Iglesia Católica, 105 DPR 123, 127 (1976). No obstante, como excepción a esta norma, está la figura de responsabilidad vicaria, que le impone responsabilidad a uno por los actos cometidos por otro. Cruz Flores *et al.* v. Hosp. Ryder *et al.*, *supra*, pág. 485. Este precepto "impone responsabilidad por los actos u omisiones, culposas o negligentes, de aquellas personas por quienes se debe responder, siempre que con la culpa o negligencia de éstas concurra la del principal, la que se presume". Hernández Vélez v. Televicentro, 168 DPR 803, 814 (2006).

En ese sentido, el Artículo 1803 del Código Civil establece que, en cuanto a la responsabilidad que alude el Artículo 1802, *supra*, responden también "los dueños y directores de un establecimiento o empresa respecto de los perjuicios causados por sus dependientes en el servicio de los ramos en que los tuvieran empleados o con ocasión de sus funciones". 31 LPRA sec. 5142. En nuestro ordenamiento jurídico la responsabilidad de los hospitales "ha estado predicada en la doctrina de responsabilidad vicaria". Márquez Vega v. Martínez Rosado, 116 DPR 397, 405 (1985).

El Tribunal Supremo de Puerto Rico ha establecido que "la responsabilidad civil extracontractual por impericia médica se impone tradicionalmente por la culpa o negligencia de un facultativo médico según emana del Artículo 1802 del Código Civil, *supra*". Cruz Flores *et al.* v. Hosp. Ryder *et al.*, *supra*, págs. 486-487.

> Ese racional máximo surge de la norma mínima de cuidado médico exigible a la luz de los modernos medios de comunicación y enseñanza, y conforme al estado de conocimiento de la ciencia y la práctica prevaleciente de la medicina, que satisfacen las exigencias generalmente reconocidas por la profesión. Cruz Flores *et al.* v. Hosp. Ryder *et al*., *supra*, pág. 487.

No obstante, el máximo foro judicial local ha reconocido que una persona que requiera atención médica tiene la alternativa de acudir a la oficina de un médico privado o recurrir a una institución hospitalaria directamente. Íd. Ante esto, se ha establecido que el Estado ha regulado la responsabilidad que tienen las instituciones hospitalarias en relación con los pacientes y los actos de mala práctica profesional acontecidos en sus instalaciones. Íd.

Por consiguiente, el Tribunal Supremo ha concluido que "las instituciones hospitalarias tienen el deber de ofrecer el grado de cuidado que ejercería [una persona] prudente y razonable en circunstancias similares". Íd. Es decir, los hospitales deben ejercer el cuidado y las medidas previsoras que una persona prudente y razonable "desplegaría ante determinadas circunstancias y que ofrezcan a sus pacientes la atención médica que su condición requiera". Blás v. Hosp. Guadalupe, 146 DPR 267, 323 (1998). Es importante reiterar que el nexo causal entre el daño y el acto negligente no se establece a base de una mera conjetura o especulación. Íd., pág. 322.

Por ello, se reconoce que "[l]a visión tradicional de concebir a un hospital como simplemente una estructura dotada de facilidades física, personal y equipo

para la práctica del arte de la medicina se ha ido desvaneciendo" debido a que el deber de cuidado del paciente no solamente corresponde al médico, sino al hospital. Núñez v. Cintrón, 115 DPR 598, 605 (1984). Sin embargo, la responsabilidad de los hospitales no es absoluta. Esto es así, ya que las instituciones hospitalarias "no tienen la obligación de prever todo peligro imaginable, pues se limita a aquellos riesgos que, con algún grado de probabilidad, serían anticipables para una persona prudente y razonable". Cruz Flores et al. v. Hosp. Ryder et al., *supra*, pág. 488.

En los casos de impericia médica, la parte demandante está en la obligación de establecer, mediante preponderancia de la prueba, que el factor que ocasionó con mayor probabilidad el daño sufrido por el paciente fue el tratamiento médico ofrecido por la parte demandada o la ausencia de proveer el tratamiento indicado y correcto. Blás v. Hosp. Guadalupe, *supra*, pág. 322. Así pues, se ha reiterado que los hospitales y médicos tienen el deber de "ofrecer a sus pacientes la atención que satisfaga las exigencias generalmente reconocidas por la profesión médica a la luz de los medios de comunicación y enseñanza". Núñez v. Cintrón, *supra*, pág. 613. Conforme a la doctrina de responsabilidad vicaria, el incumplimiento del precitado deber por el personal del hospital conlleva responsabilidad extracontractual de la institución hospitalaria frente al paciente perjudicado. Íd. Por ello, los hospitales responden vicariamente por sus empleados por actos de mala práctica profesional respecto a pacientes recluidos en dichas instituciones. Márquez Vega v. Martínez Rosado, *supra*, pág. 405.

Además, se ha resuelto que las instituciones hospitalarias responden también por políticas institucionales que obstaculicen el cuidado de los pacientes. Incluso, nuestro Tribunal Supremo ha sostenido que los hospitales responden por los daños ocasionados por no contar con el equipo básico necesario para atender una situación previsible o por tenerlo en estado obsoleto o deficiente. Fonseca *et al.* v. Hosp. HIMA, 184 DPR 281, 288 (2012).

En consonancia con lo anterior, se ha establecido que al adjudicar responsabilidad vicaria a los hospitales por los actos u omisiones de los médicos que laboran en su institución, es importante considerar la relación jurídica existente entre éstos. Cruz Flores et al. v. Hosp. Ryder et al., *supra*, pág. 489;

*véase, además*, <u>Fonseca *et al.* v. Hosp. HIMA</u>, *supra*, págs. 288-289. Así pues, la responsabilidad hospitalaria se extiende a los actos u omisiones negligentes de los médicos que son sus empleados. <u>Fonseca v. Hosp. HIMA</u>, *supra*, pág. 289. Asimismo, responden por los médicos que, aunque no son sus empleados, son parte de su facultad y están disponibles para consultas de otros médicos. <u>Íd</u>. De hecho, las instituciones hospitalarias responden de forma conjunta con los concesionarios de franquicias exclusivas que prestan servicios en el hospital cuando ocasionan actos de impericia médica. Según el Tribunal Supremo, los concesionarios pueden ser anestesiólogos, radiólogos y proveedores de servicios de sala de emergencia. <u>Íd</u>. En estos casos, el hospital responde por los actos de impericia médica por haber seleccionado a ese personal médico y tenerlo ofreciendo servicios al paciente. <u>Íd</u>.

También, el hospital tiene responsabilidad por los actos de impericia médica cometidos por galenos no empleados que gozan del privilegio de utilizar las instalaciones de la institución hospitalaria para recluir a sus pacientes privados. En este escenario, se analiza "si el hospital le asignó el paciente a ese médico no empleado o si se trata de un paciente privado del médico no empleado". <u>Íd</u>. Por otro lado, si la persona acudió al hospital directamente en busca de ayuda médica y éste le brindó los facultativos que atendieron al paciente, aplica la doctrina de autoridad aparente. Es decir, el hospital responde vicaria y solidariamente con el médico responsable del acto de impericia médica, sin importar que éste sea un empleado del hospital; uno a quien el hospital le haya concedido una franquicia para brindar servicios médicos especializados a los pacientes de éste; o uno que es miembro de la facultad del hospital y a quien éste llama en consulta para atender al paciente. <u>Íd</u>., págs. 289-290; *véase, además*, <u>Sagardía de Jesús v. Hosp. Aux. Mutuo</u>, 177 DPR 484, 512-514 (2009).

**C.**

Nuestro Tribunal Supremo tuvo la oportunidad de establecer las distinciones entre un testigo y un perito, y auscultar las categorías susceptibles de reconocerse bajo el concepto de prueba pericial y a qué retribución es acreedor cada perito por su comparecencia en una deposición, en el normativo caso de <u>San Lorenzo Trad., Inc. v. Hernández</u>, 114 DPR 704 (1983).

Consecuentemente, el alto foro define perito como una persona que ha desarrollado un conocimiento o destreza sobre una materia, a través de la educación o experiencia que puede formar una opinión que sirva de ayuda al juzgador. McNeil Healthcare v. Mun. Las Piedras II, 206 DPR 659, 677 (2021); SLG Font Bardón v. Mini-Warehosue, 179 DPR 322, 338 (2010). Además, se ha definido como esa persona entendida o individuo competente e idóneo "por poseer una adecuada capacidad". San Lorenzo Trad., Inc. v. Hernández, *supra*, pág. 709. El conocimiento de este experto, aplicado a la solución de controversias jurídicas, constituye "uno de los medios de prueba personales auxiliadores al desempeño judicial". Íd.

Es norma conocida en nuestra jurisdicción que la necesidad de la prueba pericial está cimentada en la imposibilidad de que un juez, por muy hábil y competente que sea, posea un conocimiento técnico completo sobre una variedad de materias. Íd., pág. 710. Por tanto, esta necesidad está fundamentada inevitablemente "en la fe y credibilidad humana, ya que ante la ignorancia por parte del juzgador en ciertos aspectos materiales debe imperar un principio de confianza en la palabra del hombre que permita asegurar al Tribunal que su fallo se producirá en justicia". Íd.

Por consiguiente, en cierta manera un perito también es un testigo, pues con su conocimiento o experiencia asiste a los jueces en la labor de poder interpretar materias de cierta dificultad técnica para finalmente adjudicar los hechos de un caso. Claro está, aunque el testimonio pericial y el testimonio de hechos persiguen el mismo propósito, que es el asistir al juzgador de los hechos en la búsqueda de la verdad, sus distinciones han sido claramente definidas. A estos efectos, nuestra más alta instancia judicial enumeró las siguientes diferencias importantes entre ambos:

1. El testigo generalmente es casual. Viene en contacto con un hecho o suceso en virtud de una relación extrajudicial de modo accidental, a veces fortuita. Por el contrario, el perito regularmente es seleccionado por una parte o el tribunal. Desconoce los hechos con anterioridad y formula una apreciación con posterioridad al proceso.

2. Los testigos sólo declaran lo percibido por sus sentidos y relatan hechos. El perito intencionalmente los examina y evalúa. Al testigo "se le pide noticias sobre los hechos, al perito se le pide un criterio, una apreciación: del primero se invoca la memoria; del segundo, la ciencia, que es el recuerdo de los conocimientos, o la memoria

sistemática". La declaración de un testigo versa sobre "hechos acaecidos o históricos, la del perito [sobre] acaecimientos actuales, e incluso puede aventurar los futuros en base a sus deducciones técnicas. El testigo declara sobre lo que fue objeto de su conocimiento sensorial; el perito dictamina después de haber realizado, con ocasión de ser llamado al proceso, una actividad intelectual perceptiva y deductiva".

3. Como regla general, el testimonio de un perito es reemplazable. El de un testigo presencial de hechos no. Íd., págs. 712-713 (citas omitidas).

Ahora bien, es harto conocido que bajo ciertas circunstancias la figura de un perito y la de un testigo se confunden en una sola. De conformidad con ello, el Tribunal Supremo ha establecido:

La dicotomía no es absoluta. No encaja siempre en moldes rigurosos. Cabe la posibilidad de que una persona acumule las cualidades de testigo y perito. Tal condición se configura cuando concurren las circunstancias fortuitas de un perito que presencia o participa en un hecho que subsiguientemente es total o parcialmente objeto de una contienda judicial. Nos "hallamos [ante] una doble actividad probatoria de una misma persona: actividad testifical y actividad pericial. Una misma persona actúa como testigo y perito, a través del procedimiento de la prueba de testigos". Íd., pág. 713.

Este tipo de "testigo perito" es un perito que de antemano ha obtenido conocimiento extrajudicial de los hechos pertinentes al litigio, ya sea a través de observaciones directas o por participar en eventos que luego se tornan pertinentes al pleito. Íd., pág. 718. Tal perito ha tenido percepción inmediata de los hechos, por lo que posee información irreemplazable y de ordinario, utiliza su entrenamiento especial o conocimiento técnico para percibir los sucesos que luego son objeto de un litigio. Íd.

A base de lo anterior, la casuística ha establecido tres categorías distintas de peritos, a saber: (1) el perito general, que es el perito clásico que ofrece su opinión experta con respecto a los hechos del caso, pero cuyo testimonio es reemplazable por ser uno de naturaleza técnica; (2) el perito de ocurrencia, quien ha obtenido conocimiento extrajudicial de los hechos relevantes al litigio a través de observaciones directas o por haber participado en ellos; y (3) el perito intermedio, quien en previsión al futuro o durante el procedimiento legal se ha familiarizado con los hechos del caso. Boitel Santana v. Cruz, 129 DPR 725, 731 (1999). Debido a la ausencia de legislación expresa que regule esta materia, se ha entendido que estas categorías pueden servir adecuadamente como un punto de partida para que los tribunales de nuestra jurisdicción puedan identificar y

compensar a las personas que reúnen las características que definen al testigo perito y definir el alcance de sus testimonios y el descubrimiento de prueba que se quiere ejercer sobre éstos.

Así, al perito de ocurrencia se le considera un testigo ordinario para todos los efectos. Por lo que están sujetos a descubrimiento de "toda materia no privilegiada y que sea pertinente a la controversia, aunque se trate de una opinión". Rivera Alejandro v. Algarín, 112 DPR 830, 836 (1982). La razón para la amplitud del descubrimiento de prueba es precisamente que se trata de un testigo de hechos.

Si bien un perito de ocurrencia se considera un testigo de hechos, también es considerado su testimonio como uno pericial. Ello se puede concluir de varias expresiones que ha efectuado el Tribunal Supremo en los casos que rigen esta materia. Por ejemplo, en *San Lorenzo Trading* se destacó que el ámbito del testimonio del ingeniero en ese caso estaba limitado a los hechos que percibió éste, según fue rendido en su informe, junto a sus impresiones empíricas y la opinión formada a base de ellas. San Lorenzo Trad., Inc. v. Hernández, *supra*, pág. 719. Por su parte, en *Boitel* se indicó que un médico demandado no podía emitir opiniones periciales sobre el tratamiento brindado por otro médico cuando el primero no participó en los procesos del diagnóstico y tratamiento brindados. Íd., pág. 733.

Por otra parte, la Regla 702 de las Reglas de Evidencia, 32 LPRA Ap. VI, R. 702, dispone que un perito general podrá testificar en forma de opinión o de otra manera cuando su conocimiento científico, técnico o especializado sea de ayuda para que el juzgador pueda entender la prueba o determinar un hecho en controversia. La precitada Regla 702 establece, además, que el valor probatorio del testimonio depende de:

> (a) si el testimonio está basado en hechos o información suficiente;
> (b) si el testimonio es el producto de principios y métodos confiables;
> (c) si la persona testigo aplicó los principios y métodos de manera confiable a los hechos del caso;
> (d) si el principio subyacente al testimonio ha sido aceptado generalmente en la comunidad científica;
> (e) las calificaciones o credenciales de la persona testigo; y
> (f) la parcialidad de la persona testigo. Íd.

Asimismo, la Regla 703 de Evidencia, 32 LPRA Ap. VI, R. 703, establece que una "persona está calificada para declarar como testigo pericial si posee

especial conocimiento, destreza, experiencia, adiestramiento o instrucción suficiente para calificarla como experta o perita en el asunto sobre el cual habrá de prestar testimonio".

Nuestro Tribunal Supremo ha determinado que "**[a]l momento de catalogar a una persona como perito, no se requiere que el testigo posea cierto tipo de credenciales académicas o profesionales, pues basta con tener experiencia en la materia particular, que pueda ser de ayuda al juzgador**". Cruz Flores et al. v. Hosp. Ryder et al., *supra*, pág. 494. Aun así, se ha dispuesto que, aunque existe liberalidad en cuanto a la capacidad pericial, no quiere decir que la mayor o menor competencia del perito sea irrelevante para apreciar su valor probatorio. Íd., págs. 494-495 (citas omitidas). Por ello, no contar con credenciales suficientes puede incidir en el valor probatorio del testimonio pericial. Íd. pág. 495.

En los casos donde versan controversias de impericia médica, "la especialidad de un perito en cierta área puede ser decisiva en cuanto al valor probatorio de su testimonio". Dye-Tex P.R., Inc. v. Royal Ins. Co., P.R., 150 DPR 658, 664 (2000). "La carencia de especialidad afecta el peso de la prueba pericial, pero no la cualificación", ya que "la especialidad va más al valor probatorio que a la admisibilidad o cualificación pericial". Íd., pág. 664.

Ante lo expuesto, el Tribunal Supremo ha señalado que, "aunque un generalista y un especialista cualifiquen ambos como perito bajo la [Regla 703] de Evidencia, el especialista está en mejor posición respecto al valor probatorio de su opinión, **pero ello no es factor determinante para la evaluación del testimonio pericial**". Íd., pág. 665 (énfasis suplido).

**D.**

Es norma conocida en nuestro ordenamiento jurídico que, ante la ausencia de error manifiesto, prejuicio, parcialidad o pasión, no se favorece la intervención de los tribunales apelativos para revisar la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos formuladas por el Tribunal de Primera Instancia. Ortiz Ortiz v. Medtronic, 209 DPR 759, 779 (2022). Al respecto, la Regla 42.2 de las Reglas de Procedimiento Civil dispone que "[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a

menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos". 32 LPRA Ap. V, R. 42.2.

Es decir, un tribunal apelativo no tiene facultad de sustituir por sus propias apreciaciones las determinaciones del foro de instancia. Serrano v. Auxilio Mutuo, 171 DPR 717, 741 (2007). La razón jurídica detrás de esta normativa se fundamenta en la apreciación que hace el adjudicador de los hechos de la prueba testifical, porque al ser una tarea llena de elementos subjetivos, es él quien está en mejor posición para aquilatarla. Sucn. Rosado v. Acevedo Marrero, 196 DPR 884, 917 (2016). El Tribunal de Primera Instancia es el foro que tiene la oportunidad de escuchar el testimonio y apreciar el comportamiento de los testigos. Dávila Nieves v. Meléndez Marín, 187 DPR 750, 771 (2013). Basándose en ello, adjudica la credibilidad que le merecen los testimonios. Así, la declaración directa de un sólo testigo, de ser creída por el juzgador de hechos, es prueba suficiente de cualquier hecho. SLG Rivera Carrasquillo v. AAA, 177 DPR 341, 357 (2009).

A tenor con lo anterior, se le concede respeto a la adjudicación de credibilidad realizada por el juzgador primario de los hechos, dado que el foro apelativo cuenta solamente con "récords mudos e inexpresivos". Trinidad v. Chade, *supra*, pág. 291. No obstante, la norma de deferencia judicial tiene límites y no supone una inmunidad absoluta frente a la función de los tribunales revisores. El Tribunal Supremo aclaró en Dávila Nieves v. Meléndez Marín, *supra*, por primera vez, qué constituye que un juez adjudique con pasión, prejuicio o parcialidad, o que su determinación sea un error manifiesto. Allí se concluyó que un juzgador incurre en pasión, prejuicio o parcialidad si actúa "movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que se someta prueba alguna". Íd., pág. 782.

Por otro lado, se consideran claramente erróneas las conclusiones del foro revisado si de un análisis de la totalidad de la evidencia, el foro apelativo queda convencido de que "se cometió un error, [...] [porque] las conclusiones están en

conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida". Íd., pág. 772. En otras palabras, incurre en un error manifiesto cuando "la apreciación de esa prueba se distancia de la realidad fáctica o es inherentemente imposible o increíble". Pueblo v. Toro Martínez, 200 DPR 834, 859 (2018).

Por lo tanto, la facultad de los tribunales apelativos para sustituir el criterio de los tribunales de instancia se reduce a aquellas circunstancias en las que, a la luz de la prueba admitida, "no exista base suficiente que apoye su determinación". Gómez Márquez *et al.* v. El Oriental, 203 DPR 783, 794 (2020). Como es conocido, las diferencias de criterio jurídico no cumplen con el referido estándar de revisión. Íd.

**E.**

La doctrina conocida como *res ipsa loquitur* fue introducida en Puerto Rico mediante jurisprudencia a principios del siglo XX, específicamente en Rosado v. Ponce Railway & Light Co., 18 DPR 609, 632-634 (1912), y reafirmada posteriormente en Rosado v. Ponce Ry. and Light Co., 20 DPR 564 (1914). Para que dicha doctrina resultara aplicable, debían concurrir tres requisitos fundamentales: (1) que, en circunstancias ordinarias, el tipo de accidente ocurrido no aconteciera sin mediar negligencia de otra persona; (2) que el suceso hubiera sido causado por un agente o instrumento bajo el control exclusivo del demandado; y (3) que el accidente no hubiese sido ocasionado por una acción voluntaria del demandante. *Véanse*, Nieves López v. Rexach Bonet, 124 DPR 427, 437 (1989); Marrero, Marrero, Ríos v. Albany Ins. Co., 124 DPR 831 (1989).

La referida doctrina, cuyo significado literal es "la cosa habla por sí misma", exime al demandante de la obligación de probar de forma directa la negligencia del demandado, permitiéndole establecer ese elemento esencial de la causa de acción mediante la manera en que ocurrió el accidente, es decir, a través de prueba de carácter circunstancial. J. Cuevas Segarra, La Responsabilidad Civil y el Daño Extracontractual en Puerto Rico, San Juan, Publicaciones J.T.S., Inc., 1993, Cap. VI, pág. 141.

En el precedente normativo <u>Admor, F.S.E. v. Almacén Ramón Rosa</u>, 151 DPR 711 (2000), el Tribunal Supremo de Puerto Rico eliminó la aplicación de la referida doctrina, manifestando al respecto lo siguiente:

> Nos parece que nos encontramos en el momento oportuno para desterrar de nuestro ordenamiento jurídico una figura que desde que la importamos ha sido cuestionada, que incluso en el sistema de derecho del que proviene ha sido ampliamente criticada y que de un tiempo a esta parte hemos estado limitando e impidiendo su aplicación. Por ello, en lo sucesivo se hará caso omiso de la llamada doctrina de *res ipsa loquitur* a los fines de resolver las controversias sobre negligencia en los casos de daños y perjuicios. **Las mismas serán resueltas conforme a nuestro derecho probatorio, según estatuido en nuestras Reglas de Evidencia y de acuerdo con la jurisprudencia interpretativa de las mismas.** Al así resolver, no olvidamos que las reglas del derecho común angloamericano y de otros sistemas jurídicos pueden constituir materia útil para el estudio comparado y en ocasiones el desarrollo de instituciones autóctonas. Se llega a veces a la misma conclusión por caminos diferentes. Sin embargo, no nos es permisible intentar resolver las controversias de daños y perjuicios a espaldas de la doctrina civil aplicable. Le corresponde a los tribunales darle el contenido al derecho de responsabilidad aquiliana puertorriqueño a la luz del Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, y los mecanismos disponibles en el sistema civilista de donde proviene. <u>Íd</u>., pág. 723 (énfasis suplido).

En <u>Colón y otros v. K-mart y otros</u>, 154 DPR 510 (2001), el Tribunal Supremo de Puerto Rico no sólo reafirmó la eliminación de la doctrina *res ipsa loquitur,* sino que también explicó de manera más detallada sus implicaciones. Aclaró que su destierro no significa que el demandante esté obligado a probar la negligencia únicamente con prueba directa, ya que en nuestra jurisdicción es norma reconocida que los hechos en controversia pueden establecerse mediante evidencia circunstancial. De este modo, el alto foro subrayó que la desaparición de la doctrina no limita las herramientas probatorias disponibles, ni impone una carga probatoria más rigurosa, sino que simplemente se abandona una presunción automática en favor del reclamante, manteniéndose la posibilidad de probar los elementos del caso a través de inferencias razonables sustentadas en hechos probados. <u>Íd</u>., pag. 521.

La inaplicabilidad de la doctrina *res ipsa loquitur* en Puerto Rico no significa, en modo alguno, que un demandante en casos de responsabilidad extracontractual esté obligado a demostrar la negligencia exclusivamente

mediante prueba directa. En nuestra jurisdicción, está plenamente permitido el uso de prueba circunstancial para acreditar la negligencia, tanto en acciones por daños y perjuicios como en otros tipos de reclamaciones. En ese contexto, la Regla 110(H) de las de Evidencia establece expresamente:

> Cualquier hecho en controversia es susceptible de ser demostrado mediante evidencia directa o mediante evidencia indirecta o circunstancial. Evidencia directa es aquella que prueba el hecho en controversia sin que medie inferencia o presunción alguna y que, de ser cierta, demuestra el hecho de modo concluyente. **Evidencia indirecta o circunstancial es aquella que tiende a demostrar el hecho en controversia probando otro distinto, del cual por sí o, en unión a otros hechos ya establecidos, puede razonablemente inferirse el hecho en controversia**. 32 LPRA Ap. VI, R. 110(H) (énfasis suplido).

En otras palabras, en nuestra jurisdicción los tribunales tienen la facultad de adjudicar responsabilidad a un demandado utilizando prueba circunstancial y/o inferencias razonables, sin que sea necesario recurrir a la doctrina de *res ipsa loquitur.*

**F.**

La Regla 85 del Reglamento de este Tribunal de Apelaciones se encarga de regular la imposición de sanciones económicas a toda parte que actúe con temeridad o frivolidad en la presentación de un recurso en etapa apelativa. En particular, la precitada regla dispone que:

> […]
>
> (B) **Si el Tribunal de Apelaciones determina que el recurso ante su consideración es frívolo o que se presentó para dilatar los procedimientos, lo denegará o desestimará, según sea el caso, e impondrá a la parte promovente o a su abogado o abogada las costas, los gastos, los honorarios de abogado y la sanción económica que estime apropiada, la cual deberá reflejar, en lo posible, el costo de la dilación para el Estado y para la parte opositora recurrida causado por la interposición del recurso, conforme a las guías que establezca el Tribunal de Apelaciones.**
>
> El tribunal impondrá iguales medidas a la parte promovida o a su abogado cuando determine que la contestación al recurso es frívola o que ha sido presentada para dilatar los procedimientos.
>
> (C) El Tribunal de Apelaciones impondrá costas y sanciones económicas en todo caso y en cualquier etapa a una parte, a su abogado o a su abogada por la interposición de recursos frívolos o por conducta constitutiva de demora, abandono, obstrucción o falta de diligencia en perjuicio de la eficiente administración de la justicia.

(D) **A discreción del Tribunal de Apelaciones, la sanción económica podrá ser a favor del Estado, de cualquier parte o de su abogado o abogada**.

(E) Los dictámenes del Tribunal de Apelaciones bajo esta regla, deberán ser debidamente fundamentados. Regla 85 del Reglamento del Tribunal de Apelaciones, según enmendada, In re Aprob. Enmdas. Reglamento TA, 2025 TSPR 42, pág. 114, 215 DPR __ (2025) (énfasis suplido).

**III.**

En el presente caso, el Apelante nos solicitó la revocación de la *Sentencia* del TPI en la que se declaró "Ha Lugar" la "**Demanda**" interpuesta en contra del Dr. Tarrats Ortolaza y se le condenó al pago de $201,750.00 como compensación agregada de los daños ocasionados a los Apelados.

Los señalamientos de error esgrimidos se encuentran íntimamente relacionados, por lo que se tratarán de forma conjunta en la discusión. En síntesis, el Apelante sostiene que el TPI erró (1) al no emitir ciertas determinaciones de hechos conforme a la prueba testifical, documental y pericial presentada; (2) en su apreciación de la prueba, (3) al descartar la evidencia pericial más robusta y (4) al resolver el caso bajo la doctrina de *res ipsa loquitur*. No nos convence su postura. Veamos.

Del expediente ante nuestra consideración se desprende que, el 8 de septiembre de 2018, el señor Alvarado Vargas fue intervenido quirúrgicamente por el Dr. Tarrats Ortolaza, en atención a un cuadro clínico consistente en obstrucción nasal con desviación del tabique nasal, sinusitis y apnea obstructiva del sueño. De dicho expediente también se evidencia que, durante el procedimiento, el Apelante cortó accidentalmente la línea de inflado del "cuff" del tubo endotraqueal, lo que ocasionó que el señor Alvarado Vargas sufriera las siguientes lesiones: (1) lesión del paladar blando, (2) quemadura térmica en la lengua, (3) quemadura de segundo grado en el labio y (4) dolor postoperatorio. Como consecuencia de estos hechos, el señor Alvarado Vargas, junto a su esposa e hija, presentó una "**Demanda**" por impericia médica contra el Dr. Tarrats Ortolaza, el anestesiólogo y el equipo de anestesia que participó en la intervención, sus respectivas sociedades legales de gananciales, así como contra el Hospital Menonita.

Tras un trámite procesal extenso, incluyendo la celebración del juicio en su fondo, el 22 de enero de 2025 el TPI emitió una *Sentencia* en la que declaró "Ha Lugar" la "**Demanda**" en contra del Dr. Tarrats Ortolaza. Específicamente el foro de instancia adjudicó las siguientes sumas en concepto de indemnización: (1) $150,000.00 por los daños físicos sufridos por el señor Alvarado Vargas y $35,000.00 por sus angustias y sufrimientos mentales; (2) $10,000.00 por daños emocionales a favor de la señora Vega Colón y (3) $5,000.00 por el mismo concepto a favor de la hija. Adicionalmente, se concedió la cantidad de $1,750.00 para cubrir los gastos relacionados con la reparación de un diente fracturado.

Para facilitar la comprensión de nuestro análisis, procedemos a resumir la prueba testifical que tuvo ante sí el foro sentenciador.

**Francisco J. Alvarado Vargas**

El señor Alvarado Vargas testificó, bajo juramento, que el 6 de septiembre de 2018 fue sometido a una intervención quirúrgica por el Dr. Tarrats Ortolaza, con el propósito de corregir una desviación del tabique nasal, sinusitis crónica y apnea obstructiva del sueño.[3] Expresó que previo a esa fecha, gozaba de buena salud, no tenía condiciones médicas significativas, ni presentaba problemas dentales, incluyendo ausencia de piezas o fracturas visibles.[4] Declaró que, al despertar de la anestesia, experimentó un dolor físico agudo y una vivencia intensa que describió como "viajar por un túnel".[5] Detalló que en ese estado escuchó la voz del médico llamándolo y que, al recuperar completamente la conciencia, su esposa le indicó que algo había pasado durante la operación.[6]

Asimismo, el señor Alvarado Vargas expresó que, tras el procedimiento, observó que uno de sus dientes frontales superiores estaba fracturado, lo que generaba un hueco notorio en su dentadura.[7] Declaró que este daño fue posteriormente evaluado por el Dr. Omar Rivera López, dentista de la Clínica Dental La Montaña, quien le recomendó restaurar no solo la pieza afectada, sino cuatro (4) dientes en total para preservar la armonía estética de su sonrisa.[8] Testificó que se le colocaron prótesis temporales y, más adelante, implantes

---

[3] *Véase*, <u>Transcripción de la prueba oral</u>, págs. 56, 77 y 78.
[4] *Véase*, <u>Transcripción de la prueba oral</u>, págs. 58 y 76.
[5] *Véase*, <u>Transcripción de la prueba oral</u>, págs. 72-74.
[6] *Véase*, <u>Transcripción de la prueba oral</u>, págs. 75 y 76.
[7] *Véase*, <u>Transcripción de la prueba oral</u>, págs. 98 y 99.
[8] *Véase*, <u>Transcripción de la prueba oral</u>, págs. 99, 101 y 103.

dentales permanentes. Asimismo, indicó que el tratamiento generó un gasto total de $3,875.00, de los cuales pagó personalmente $900.00 y el resto fue cubierto por su aseguradora.[9]

En relación con su estado físico posterior a la cirugía, el señor Alvarado Vargas declaró que sufrió quemaduras en los labios, lengua y paladar superior, lo que le impedía tragar con normalidad e incluso le dificultaba la ingesta de líquidos, tanto fríos como calientes.[10] Expresó que esta situación le provocó una pérdida considerable de peso y que, debido a la gravedad de su estado nutricional, fue advertido por el personal médico de la posibilidad de someterlo a una traqueotomía si no lograba alimentarse adecuadamente.[11] Detalló que permaneció más de diez (10) días sin ingerir alimentos sólidos y que retomó la alimentación solo luego de recibir autorización médica, aunque con intenso dolor.[12] Durante su estadía en la sala de intensivo del Hospital, relató que fue trasladado al consultorio del Dr. Tarrats Ortolaza en bata y ropa interior, sin protección facial, frente a otros pacientes, algunos de los cuales lo conocían. Testificó que el Dr. Tarrats Ortolaza le realizó un procedimiento que originalmente debía haberse llevado a cabo semanas después y que, aunque se le administró anestesia local, sintió un dolor insoportable durante la intervención, afectando aún más su estado emocional.[13]

El señor Alvarado Vargas declaró que, al regresar a su hogar, continuó su recuperación con la ayuda de su hija, quien le realizaba lavados nasales diarios.[14] Detalló que también debía hacer enjuagues bucales por las quemaduras y que no podía tragar adecuadamente, lo que le causaba frustración constante.[15] Expresó que, como consecuencia del incidente, su vida cambió drásticamente pues se volvió retraído, se aisló emocionalmente y su relación familiar y social se vio afectada. Testificó que, al cepillarse los dientes o al comer, revivía el trauma al recordar el daño sufrido. Explicó que soñaba repetidamente con que se le caían los dientes o que se estaba quemando, lo cual afectaba su calidad de sueño.[16]

---

[9] *Véase*, Transcripción de la prueba oral, págs. 103-104, 110, 118 y 119.
[10] *Véase*, Transcripción de la prueba oral, págs. 139 y 147.
[11] *Véase*, Transcripción de la prueba oral, págs. 168-170.
[12] *Véase*, Transcripción de la prueba oral, pág. 173.
[13] *Véase*, Transcripción de la prueba oral, págs. 137-138.
[14] *Véase*, Transcripción de la prueba oral, pág. 175.
[15] *Véase*, Transcripción de la prueba oral, págs. 145-148.
[16] *Véase*, Transcripción de la prueba oral, págs. 181-190.

En cuanto al impacto emocional, declaró haber buscado ayuda profesional con un psiquiatra, el Dr. Bacó Alfaro, quien le recetó medicamentos que continúa utilizando. Expresó que asiste a citas cada tres (3) meses, aunque reconoció que, pese al tratamiento, sigue teniendo recuerdos intrusivos, ansiedad y episodios depresivos vinculados al trauma sufrido.[17] En el ámbito laboral, testificó que estuvo ausente de su empleo durante un periodo significativo tras la operación, debido a citas médicas y tratamientos. No obstante, declaró haber retomado sus funciones una vez obtuvo el alta, aunque aún interrumpe su jornada laboral para continuar con el tratamiento psiquiátrico.[18]

Asimismo, el señor Alvarado Vargas manifestó que regresó a varias citas de seguimiento con el Dr. Tarrats Ortolaza, pero que en una de ellas le expresó directamente que no podía continuar atendiéndose con él, dado el impacto emocional que le causaba. Detalló que el Dr. Tarrats Ortolaza le pidió disculpas por lo ocurrido y elogió su fortaleza al haber soportado tanto dolor. Sin embargo, el señor Alvarado Vargas declaró que no volvió a su consultorio. Indicó además que, aunque el doctor se ofreció a reparar el diente afectado, rechazó dicha oferta.[19] Finalmente, el señor Alvarado Vargas aclaró que el diente afectado por la fractura tras la cirugía no era el mismo que había sido tratado durante su niñez por una lesión previa, explicando que aquella situación involucró otra pieza dental que fue restaurada con una corona de oro.[20]

**Carmen Iris Vega Colón**

La señora Vega Colón, esposa del señor Alvarado Vargas durante más de veintisiete (27) años, testificó que acompañó a su esposo el 6 de septiembre de 2018, día en que fue intervenido quirúrgicamente por el Dr. Tarrats Ortolaza.[21] Expresó que estuvo en la sala de espera del hospital durante varias horas hasta que fue llamada por una secretaria para hablar con el médico, a quien no conocía.[22] Detalló que, durante dicha conversación, el Dr. Tarrats Ortolaza le informó que la operación había sido exitosa, pero que, en el proceso de cauterización, había ocurrido un percance que describió de la siguiente forma: se

---

[17] *Véase*, <u>Transcripción de la prueba oral</u>, págs. 183-185.
[18] *Véase*, <u>Transcripción de la prueba oral</u>, págs. 186-188
[19] *Véase*, <u>Transcripción de la prueba oral</u>, págs. 191-195.
[20] *Véase*, <u>Transcripción de la prueba oral</u>, págs. 261-262.
[21] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 271.
[22] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 276.

había soltado un cable de oxígeno que provocó una chispa que causó quemaduras en la lengua y el paladar de su esposo.[23] Añadió que el Dr. Tarrats Ortolaza no le mencionó en ese momento la pérdida de un diente.

Relató que acompañó al doctor a la sala de operaciones, donde vio a su esposo en muy mal estado, notablemente hinchado, y sin un diente, situación que la sorprendió profundamente, ya que no había sido advertida de ello.[24] Indicó que el señor Alvarado Vega, al verla, le pidió irse a casa, pero que ella lo tranquilizó y se apartó nuevamente con el médico, quien le informó que sería ingresado en intensivo bajo cuidado de la unidad de manejo del dolor.[25] Testificó que solicitó quedarse con él y que logró hacerlo, durmiendo en un sillón al lado de su cama esa noche.[26] Describió que durante la madrugada las máquinas comenzaron a sonar y que alertó al personal, quienes determinaron que su esposo se había dormido profundamente.[27]

Explicó que, al día siguiente, el señor Alvarado Vargas fue llevado a la oficina del Dr. Tarrats Ortolaza, donde le realizaron un procedimiento en la nariz. Manifestó que estuvo presente y que, aunque el médico comentó que todo se veía bien, el procedimiento fue claramente doloroso.[28] Añadió que continuó quedándose junto a él en el área de intensivo por varias noches consecutivas, durmiendo en un sillón.[29] Detalló que ningún miembro del personal médico realizó los lavados nasales que su esposo requería, por lo que su hija acudía diariamente al hospital para llevarlos a cabo y ella estuvo presente en múltiples ocasiones cuando esto ocurría.[30] La señora Vega Colón declaró que también estuvo presente cuando su esposo fue dado de alta por primera vez.[31] Expresó que, al llegar a su hogar, él se mostró profundamente deprimido, rehusándose a hablar con la familia, a comer o a tomar medicamentos, alegando que le era imposible tragar debido al dolor y a la presencia de sangre.[32] Indicó que las noches eran

---

[23] *Véase*, Transcripción de la prueba oral, págs. 278-281.
[24] *Véase*, Transcripción de la prueba oral, pág. 282.
[25] *Véase*, Transcripción de la prueba oral, pág. 283.
[26] *Véase*, Transcripción de la prueba oral, pág. 283.
[27] *Véase*, Transcripción de la prueba oral, pág. 284.
[28] *Véase*, Transcripción de la prueba oral, págs. 290-292.
[29] *Véase*, Transcripción de la prueba oral, pág. 296.
[30] *Véase*, Transcripción de la prueba oral, págs. 297-298.
[31] *Véase*, Transcripción de la prueba oral, pág. 300.
[32] *Véase*, Transcripción de la prueba oral, págs. 302-306.

especialmente difíciles, pues él no dormía, tenía pesadillas y lloraba con frecuencia, lo que la obligaba a mantenerse en constante vigilancia.[33]

Testificó que, al cuarto día en el hogar, debido al deterioro de la condición del señor Alvarado Vargas, intentó contactar al Dr. Tarrats Ortolaza sin éxito, pero que su hija logró comunicarse con él.[34] Posteriormente, ella logró hablar directamente con el referido galeno, a quien le suplicó que lo hospitalizara, ante lo cual inicialmente se negó, pero más tarde la secretaria de él la llamó para indicarle que lo llevara a la sala de emergencias con la intención de internarlo.[35] Detalló que, una vez en el hospital, el señor Alvarado Vargas fue ingresado en una camilla sin atención médica inmediata, permaneciendo allí durante muchas horas sin recibir información o tratamiento.[36] Expresó que fue ella quien advirtió que él tenía fiebre y que, tras su insistencia, le administraron Tylenol, pero ni siquiera le ofrecieron agua, por lo que ella le proveyó de la suya personal.[37]

Relató que esa noche permaneció sentada en una silla hasta que en la madrugada lo trasladaron a un cuarto aislado, donde logró descansar brevemente en la camilla que él había usado.[38] Manifestó que no se separó de su esposo en ningún momento durante su segunda hospitalización y que fue en ese nuevo cuarto donde finalmente lo atendió personal médico, incluyendo al Dr. Tarrats Ortolaza, quien ordenó su traslado al área de bariatría.[39] Detalló que allí recibió suero y medicamentos para el dolor, pero aún sin explicación clara de su diagnóstico.[40] La señora Vega Colón expresó que una doctora de piso fue la primera en brindarle apoyo emocional, pero que la situación era crítica, ya que su esposo se debilitaba cada día, no podía ingerir alimentos por el dolor de las quemaduras y ni siquiera toleraba vitaminas.[41]

Manifestó que el infectólogo consideró instalarle un tubo de alimentación, pero que ella se negó con firmeza, creyendo que él se recuperaría. También relató su frustración al tener que explicar repetidamente lo ocurrido a diferentes

---

[33] *Véase*, Transcripción de la prueba oral, pág. 307.
[34] *Véase*, Transcripción de la prueba oral, págs. 310-311.
[35] *Véase*, Transcripción de la prueba oral, pág. 312.
[36] *Véase*, Transcripción de la prueba oral, págs. 313-314.
[37] *Véase*, Transcripción de la prueba oral, pág. 315.
[38] *Véase*, Transcripción de la prueba oral, pág. 316.
[39] *Véase*, Transcripción de la prueba oral, pág. 319.
[40] *Véase*, Transcripción de la prueba oral, págs. 320-321.
[41] *Véase*, Transcripción de la prueba oral, págs. 322-324.

profesionales, a quienes pidió que revisaran los récords médicos.[42] Afirmó que, tras varios días hospitalizado, fue dado de alta y regresó al hogar, donde la situación familiar se tornó aún más difícil. Expresó que su esposo estaba irritable, retraído y emocionalmente inestable, generando tensión y conflictos en el hogar.[43] Indicó que ella misma se sintió emocional y mentalmente afectada, sin poder concentrarse o descansar, y que comenzó tratamiento psicológico con una psicóloga y luego con un psiquiatra, a quien continúa visitando cada tres (3) meses.[44] Finalmente, declaró que el señor Alvarado Vargas no tolera hablar de hospitales, médicos ni procedimientos y que desde el evento ha desarrollado un rechazo profundo a cualquier tratamiento de salud, lo cual ha afectado seriamente su vida familiar y emocional.[45]

### Dr. José Ortiz Feliciano

El Dr. Ortiz Feliciano testificó a favor de los Apelados y fue presentado para ser cualificado como perito en cirugía de cabeza y cuello, así como en materia de fuegos en sala de operaciones y vías respiratorias. Manifestó que es médico retirado desde el año 2018 y que posee licencia médica vigente desde 1981.[46] Detalló que completó su residencia en cirugía general y ejerció como cirujano por más de 35 años en distintos hospitales de Puerto Rico, incluyendo el Centro Médico de Mayagüez, el Hospital de Aguadilla, la Clínica Gubernamental de Fajardo y el Hospital Font Martelo de Humacao, entre otros.[47] Expresó que sus privilegios hospitalarios en Caribbean Hospital le fueron suspendidos en 2017, tras complicaciones derivadas del huracán María, situación que originó un proceso administrativo que aún estaba activo al momento de su testimonio.[48] Agregó que también enfrentó una sumaria en el Hospital San Pablo en el año 2000, la cual no concluyó debido al cierre del hospital.[49]

En cuanto a su práctica profesional, testificó que realizó procedimientos quirúrgicos en todas las regiones del cuerpo, con particular énfasis en cirugía oncológica de cabeza y cuello, incluyendo intervenciones en tiroides, paratiroides,

---

[42] *Véase*, Transcripción de la prueba oral, pág. 324.
[43] *Véase*, Transcripción de la prueba oral, págs. 329-330.
[44] *Véase*, Transcripción de la prueba oral, págs. 345-346.
[45] *Véase*, Transcripción de la prueba oral, pág. 348.
[46] *Véase*, Transcripción de la prueba oral, págs. 410-411.
[47] *Véase*, Transcripción de la prueba oral, págs. 412-415.
[48] *Véase*, Transcripción de la prueba oral, págs. 415-416.
[49] *Véase*, Transcripción de la prueba oral, pág. 417.

lengua, faringe, laringe y reconstrucción del esófago cervical.[50] Explicó que, en dichas cirugías, su rol era principalmente como cirujano principal, aunque en ocasiones trabajaba en conjunto con especialistas en otorrinolaringología.[51] Manifestó sentirse cómodo realizando procedimientos complejos debido a su experiencia y adiestramiento.[52]

Respecto a su experiencia en materia de fuegos quirúrgicos, expresó que los "airway fires" o incendios en las vías respiratorias son eventos poco frecuentes, pero conocidos dentro del campo quirúrgico, particularmente cuando se utilizan gases volátiles.[53] Detalló que adquirió este conocimiento como parte de su entrenamiento en cirugía del "upper respiratory airway" y mediante cursos ofrecidos por los hospitales de Mayagüez y Fajardo sobre "airway fires" y "operating room fires".[54] Asimismo, afirmó haber revisado literatura médica especializada en esta materia.[55]

En cuanto a su conocimiento sobre la labor del anestesiólogo, manifestó que todos los cirujanos deben mantener una relación de colaboración con estos profesionales, ya que la planificación conjunta del procedimiento es fundamental para el éxito de la intervención. Señaló que, como parte de su práctica y sus rotaciones médicas, ha adquirido un conocimiento básico sobre los equipos utilizados por anestesiólogos, incluyendo tubos endotraqueales, laringoscopios y máquinas de anestesia, indicando además que ha utilizado algunos de estos instrumentos directamente en sala.[56] Por otro lado, testificó que ha participado como perito en al menos diez (10) casos ante tribunales, además de haber evaluado más de doscientos (200) casos clínicos en calidad consultiva.[57] Expresó que nunca ha sido descalificado como perito, salvo por una controversia inicial en el Tribunal de los Estados Unidos para el Distrito de Puerto Rico que fue posteriormente revertida por el Tribunal de Circuito de los Estados Unidos para el Primer Circuito, el cual validó su informe y autorizó su testimonio.[58]

---

[50] *Véase*, <u>Transcripción de la prueba oral</u>, págs. 417-419.
[51] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 418.
[52] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 418.
[53] *Véase*, <u>Transcripción de la prueba oral</u>, págs. 420-424.
[54] *Véase*, <u>Transcripción de la prueba oral</u>, págs. 423- 431.
[55] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 420.
[56] *Véase*, <u>Transcripción de la prueba oral</u>, págs. 425-426.
[57] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 429.
[58] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 429.

Respecto a los hechos de la controversia ante nuestra consideración, testificó que, al preparar su opinión pericial, revisó los récords médicos del hospital y de la oficina del Dr. Tarrats Ortolaza.[59] Confirmó que en las visitas previas a la cirugía no se mencionaron quemaduras ni riesgos de fuegos en la vía respiratoria.[60]  Expresó que, durante la cirugía del 6 de septiembre de 2018, el Dr. Tarrats Ortolaza realizaba una endoscopía y una cirugía uvulopalatofaringoplastia (UPP3).[61] Afirmó que a las 11:40 a.m., según la nota de la enfermera Ramos, el Dr. Tarrats Ortolaza informó un evento con el "cuff" del tubo endotraqueal.[62] Declaró que el propio Tarrats Ortolaza indicó que el "cuff" fue accidentalmente roto al introducir un instrumento quirúrgico.[63] Añadió que esta ruptura provocó una fuga extensa de gases volátiles al campo quirúrgico, transformando el sistema cerrado de ventilación en un circuito abierto.[64] Explicó que esta fuga de gases alteró la integridad del sistema respiratorio artificial, permitiendo la acumulación de oxígeno y óxido nitroso en la cavidad oral. Señaló que esta condición, conocida como "oxidizer-enriched atmosphere", genera un entorno altamente inflamable con riesgo crítico de combustión.[65] Indicó que hubo un retraso injustificado de cinco (5) minutos en apagar el suministro de oxígeno tras identificarse la ruptura del tubo.[66]

Sostuvo, además, que el Dr. Tarrats Ortolaza debió haber suspendido inmediatamente la intervención quirúrgica al detectarse el escape de gases y debió haber coordinado con el equipo de anestesia para proceder al reemplazo del tubo endotraqueal. Observó que, en lugar de ello, el Dr. Tarrats Ortolaza continuó con el uso de un dispositivo de electrocauterio durante la manipulación del pilar izquierdo, lo cual, según el Dr. Ortiz Rodríguez, actuó como fuente de ignición en un campo quirúrgico ya saturado de gases inflamables.[67] Afirmó que el Dr. Tarrats Ortolaza no logró reducir la concentración de oxígeno mediante la succión o "suction scavenging" alrededor del campo quirúrgico.[68]

---

[59] *Véase*, Transcripción de la prueba oral, págs. 561-571.
[60] *Véase*, Transcripción de la prueba oral, págs. 572-584.
[61] *Véase*, Transcripción de la prueba oral, pág. 594.
[62] *Véase*, Transcripción de la prueba oral, págs. 622-624.
[63] *Véase*, Transcripción de la prueba oral, págs. 636-637.
[64] *Véase*, Transcripción de la prueba oral, págs. 637-642.
[65] *Véase*, Transcripción de la prueba oral, págs. 746-751.
[66] *Véase*, Transcripción de la prueba oral, pág. 746.
[67] *Véase*, Transcripción de la prueba oral, págs. 753-760.
[68] *Véase*, Transcripción de la prueba oral, pág. 752.

Indicó que el fuego fue provocado por la interacción de tres elementos críticos, a saber: (1) una atmósfera enriquecida con oxígeno y óxido nitroso, (2) la presencia de un material inflamable (el tubo endotraqueal y tejidos del paciente), y la activación del electrocauterio durante la cauterización del "left pilar".[69] Específicamente, señaló que el Dr. Tarrats Ortolaza realizó un juicio clínico al considerar que el sangrado podía ser controlado mediante cauterización, pero no tomó en cuenta que parte de ese juicio clínico implica reconocer que, en ese momento, la cavidad estaba llena de gases volátiles, lo cual hacía inapropiado el uso del cauterio. Indicó que, ante esa situación, lo correcto hubiera sido optar por la comprensión para controlar el sangrado mientras se solucionaba el problema con el tubo. [70] Opinó que, de haberse utilizado la técnica de compresión mecánica con una esponja para detener el sangrado, en lugar del uso de calor, el incendio se habría evitado.[71] Recalcó que el Dr. Tarrats Ortolaza también falló al no implementar una succión ("suction scavenging") para evacuar los gases acumulados en la cavidad oral, lo que habría reducido significativamente el riesgo de ignición.[72]

Finalmente, testificó que lo sucedido se trató de un error médico prevenible que pudo haberse evitado con una mejor coordinación y comunicación entre el cirujano y el equipo de anestesia.[73] Señaló que el fuego fue extinguido tras desconectar el oxígeno y aplicar agua estéril sobre el área afectada.[74] Advirtió que la temperatura generada por este tipo de incendio puede alcanzar hasta 578 grados Fahrenheit o más, lo cual explicó la gravedad de las quemaduras sufridas por el paciente, esto es, segundo grado en la lengua, paladar y labios, así como daño dental en el incisivo frontal izquierdo.[75]

**Dr. Carlos J. Bacó Alfaro**

El Dr. Bacó Alfaro declaró, bajo juramento, que ejerce la profesión de médico psiquiatra.[76] Testificó haber comenzado a ejercer como psiquiatra en el año 2003, tras completar estudios de Medicina en Barcelona, España, trabajar

---

[69] *Véase*, Transcripción de la prueba oral, págs. 679-696.
[70] *Véase*, Transcripción de la prueba oral, pág. 831.
[71] *Véase*, Transcripción de la prueba oral, pág. 831.
[72] *Véase*, Transcripción de la prueba oral, pág. 752.
[73] *Véase*, Transcripción de la prueba oral, pág. 746.
[74] *Véase*, Transcripción de la prueba oral, pág. 734.
[75] *Véase*, Transcripción de la prueba oral, págs. 666, 688 y 836.
[76] *Véase*, Transcripción de la prueba oral, pág. 1065.

como generalista en Puerto Rico y realizar su residencia en el Instituto de Psiquiatría de Puerto Rico del año 2000 al 2003.[77] Indicó que actualmente mantiene una práctica clínica en Bayamón y Barranquitas, asistiendo a esta última los jueves y viernes.[78] Afirmó haber tratado al señor Alvarado Vargas mediante psicoterapia y farmacoterapia, y confirmó que preparó récords médicos relacionados a ese tratamiento.[79] Expresó que la primera cita con el señor Alvarado Vargas fue el 7 de marzo de 2019, cuando éste le relató haber sufrido un incidente quirúrgico en el que se produjo fuego durante la operación, resultando en hospitalización intensiva y lesiones dentales.[80]

Expuso que el señor Alvarado Vargas le narró síntomas como pesadillas, "flashbacks", pérdida de peso, angustia y pensamientos negativos recurrentes. Expresó que el señor Alvarado Vargas manifestó sentimientos intensos por el otorrinolaringólogo que lo operó.[81] Indicó haber diagnosticado trastorno de estrés postraumático crónico, depresión mayor, episodio único severo y trastorno de personalidad.[82] Añadió que el señor Alvarado Vargas también presentaba rinitis crónica y se hallaba afectado funcionalmente según el eje GAF, con puntuación de 50 a 60, lo que significa que no está funcionando a su capacidad máxima.[83] Relató que el tratamiento inicial consistió en Zoloft y Clonazepam. Señaló que posteriormente sustituyó el Zoloft por Lexapro debido a efectos secundarios y falta de respuesta terapéutica. Explicó que el Lexapro era más efectivo para manejar la ansiedad persistente del señor Alvarado Vargas.[84] Manifestó que el señor Alvarado Vargas negó ideas suicidas u homicidas activas, aunque documentó pensamientos pasivos relacionados a la muerte. Observó afecto deprimido y ansioso, sin alucinaciones ni delirios, y comentó que se le indicaron "refills" y seguimiento cada tres (3) meses.[85] Detalló que las citas continuaron hasta marzo de 2020 y luego en abril de 2024. Durante éstas, persistieron las pesadillas, "flashbacks", alteraciones del sueño y presión laboral. Por último, reiteró que el

---

[77] *Véase*, Transcripción de la prueba oral, págs. 1065-1066.
[78] *Véase*, Transcripción de la prueba oral, pág. 1066.
[79] *Véase*, Transcripción de la prueba oral, pág. 1067.
[80] *Véase*, Transcripción de la prueba oral, pág. 1073.
[81] *Véase*, Transcripción de la prueba oral, págs. 1074-1076.
[82] *Véase*, Transcripción de la prueba oral, pág. 1082.
[83] *Véase*, Transcripción de la prueba oral, págs. 1082-1083.
[84] *Véase*, Transcripción de la prueba oral, págs. 1083-1091.
[85] *Véase*, Transcripción de la prueba oral, págs. 1086-1087.

señor Alvarado Vargas mantenía sintomatología compatible con sus diagnósticos iniciales.[86]

**Dr. Omar Rivera López**

El Dr. Omar Rivera López testificó que es dentista de profesión desde el año 2000. Declaró haber trabajado inicialmente en otra oficina dental desde el 2000 hasta aproximadamente el 2019 y que desde el año 2022 ejerce en su propia oficina dental en Coamo.[87] Indicó que evaluó al señor Alvarado Vargas el 25 de septiembre de 2018 y el 3 de diciembre de 2018 en su oficina dental, luego de que éste le relatara que había sufrido un incidente quirúrgico en el que se produjo fuego dentro de su cavidad oral durante una operación nasal.[88]

Indicó que, durante la primera evaluación, el señor Alvarado Vargas acudió acompañado de su esposa, ya que se encontraba visiblemente afectado. Intentó realizarle un examen clínico, pero éste no fue completo debido a que el señor Alvarado Vargas presentaba úlceras en los labios, compatibles con quemaduras, lo que le causaba mucho dolor al ser tocado en esa área y se le dificultaba abrir la boca.[89] Durante esa evaluación, observó quemaduras residuales en el paladar y la mucosa oral, así como una fractura en la pieza dental número nueve (9), específicamente en el área mesioincisal, además de fracturas en la corona clínica de los dientes números siete (7), ocho (8) y diez (10).[90] Por tal razón, decidió posponer el examen hasta que el señor Alvarado Vargas estuviera en mejores condiciones.[91]

Manifestó que el 3 de diciembre de 2018 llevó a cabo una segunda evaluación, en la que logró tomar una radiografía de los cuatro (4) dientes frontales.[92] Señaló que la pieza dental número ocho (8) no tuvo respuesta al frío, al calor ni a la percusión, lo cual es indicativo de necrosis o muerte del nervio.[93] En cuanto a la pieza número nueve (9), presentó resultados negativos al frío y al calor, pero positivo a la percusión, lo que expresó sugiere la existencia de un

---

[86] *Véase*, Transcripción de la prueba oral, págs. 1089-1096.
[87] *Véase*, Transcripción de la prueba oral, pág. 1177.
[88] *Véase*, Transcripción de la prueba oral, pág. 1188.
[89] *Véase*, Transcripción de la prueba oral, pág. 1189.
[90] *Véase*, Transcripción de la prueba oral, pág. 1189.
[91] *Véase*, Transcripción de la prueba oral, pág. 1191.
[92] *Véase*, Transcripción de la prueba oral, pág. 1191.
[93] *Véase*, Transcripción de la prueba oral, pág. 1192.

trauma.[94] La pieza número seis (6) respondió positivamente al frío y al calor, pero negativamente a la percusión, indicando que el diente estaba vital.[95] Testificó que la pieza número once (11) mostró respuesta positiva al frío, pero negativa al calor y a la percusión, lo que evidenciaba que el nervio no estaba comprometido.[96] Indicó que realizó un tratamiento de canal en la pieza número nueve (9).[97]

Asimismo, afirmó que la causa de estos daños podría estar relacionada con un trauma.[98] Recomendó colocar postes y coronas en las piezas ocho (8) y nueve (9) debido a los tratamientos de conducto realizados y también sugirió reemplazar la corona defectuosa en la pieza número diez (10).[99] Finalmente, mencionó que cobró por dicho servicio la cantidad de $3,875.00, suma que expresó fue pagada en su totalidad por el señor Alvarado Vargas.[100]

### Dr. Charles Juarbe Santos

El Dr. Juarbe Santos testificó que es médico especialista en otorrinolaringología, cirugía de cabeza y cuello desde 1988, con privilegios en los hospitales Auxilio Mutuo y San Pablo de Bayamón.[101] Sobre los hechos del presente caso, declaró que el Dr. Tarrats Ortolaza detectó un escape en el tubo endotraqueal al finalizar la cirugía y que, tras revisar la literatura médica, concluyó que no hubo impericia ni negligencia médica.[102] Expresó que el señor Alvarado Vargas sufrió una complicación reconocida en cirugía, esto es, un destello o flama en sala de operaciones, que causó quemaduras orales que sanaron en tres semanas y la fractura de un diente, la cual también consideró una complicación conocida.[103]

Manifestó que, al retirar el abrebocas para aliviar la tensión en la cavidad oral, el Dr. Tarrats Ortolaza notó un gorgojeo de aire, movió los paños quirúrgicos hacia abajo y observó que el señor Alvarado Vargas presentaba un sangrado arterial.[104] Precisó que el sangrado provenía de la amígdala superior izquierda y que, debido a la presencia de oxígeno en una cavidad pequeña, el uso del

---

94 *Véase*, Transcripción de la prueba oral, pág. 1192.
95 *Véase*, Transcripción de la prueba oral, pág. 1192.
96 *Véase*, Transcripción de la prueba oral, págs. 1192-1193.
97 *Véase*, Transcripción de la prueba oral, pág. 1193.
98 *Véase*, Transcripción de la prueba oral, pág. 1195.
99 *Véase*, Transcripción de la prueba oral, pág. 1197.
100 *Véase*, Transcripción de la prueba oral, pág. 1199.
101 *Véase*, Transcripción de la prueba oral, págs. 1279-1280.
102 *Véase*, Transcripción de la prueba oral, págs. 1329-1331.
103 *Véase*, Transcripción de la prueba oral, pág. 1331.
104 *Véase*, Transcripción de la prueba oral, págs. 1332-1333.

electrocauterio provocó el destello.[105] Sostuvo que el gorgojeo era señal de fuga de aire y gases alrededor del "cuff" del tubo endotraqueal y que el Dr. Tarrats Ortolaza actuó correctamente colocando un paño y notificando al anestesiólogo para que verificara la fuga.[106] Indicó que, aunque la cirugía ya había concluido, era necesario cambiar el tubo, lo que requería un campo limpio y seco para no comprometer la visibilidad del anestesiólogo.[107]

De igual manera, afirmó que en este tipo de cirugía siempre hay succión constante para facilitar la visibilidad y que el Dr. Tarrats Ortolaza utilizó el electrocauterio para controlar el sangrado[108] Expresó que, durante el cambio del tubo, el anestesiólogo retiró el tubo endotraqueal y utilizó un "bougie" para facilitar el procedimiento.[109] Relató que el retractor quedó colocado en la mesa operatoria. Señaló que, una vez reintubado el paciente, el Dr. Tarrats Ortolaza volvió a colocar el abrebocas para inspeccionar, succionar y asegurarse de que todo estuviera en orden. Declaró que, debido a la lesión en las mucosas, el Dr. Tarrats Ortolaza realizó una laringoscopía directa y una broncoscopía para examinar los tejidos.[110]

Explicó que con la laringoscopía se inspeccionaron la epiglotis, las cuerdas vocales, la supraglotis, los senos piriformes y la vallecula, que es el espacio entre la epiglotis y la base de la lengua, para descartar lesiones o quemaduras adicionales.[111] Aclaró que, aunque la broncoscopía no era estrictamente necesaria debido a la dirección del destello, el protocolo exigía revisar la tráquea y los bronquios. Señaló que la evaluación broncoscópica fue normal, mientras que la laringoscopía reveló quemaduras en la orofaringe, el paladar, la lengua y posiblemente en los labios.[112] Indicó que estas áreas están revestidas de mucosa, un tejido escamoso que recubre las estructuras internas.[113] En su opinión, las lesiones correspondían a quemaduras superficiales de primer grado, aunque en el informe quirúrgico se describieron como de segundo grado. Justificó su evaluación al señalar que no hubo descamación ni signos de daño más

---

[105] *Véase*, Transcripción de la prueba oral, págs. 1334-1338.
[106] *Véase*, Transcripción de la prueba oral, pág. 1343.
[107] *Véase*, Transcripción de la prueba oral, págs. 1344-1345.
[108] *Véase*, Transcripción de la prueba oral, págs. 1347-1349.
[109] *Véase*, Transcripción de la prueba oral, pág. 1355.
[110] *Véase*, Transcripción de la prueba oral, pág. 1355.
[111] *Véase*, Transcripción de la prueba oral, pág. 1356.
[112] *Véase*, Transcripción de la prueba oral, pág. 1357.
[113] *Véase*, Transcripción de la prueba oral, pág. 1360.

profundo.[114] Añadió que el paciente cicatrizó en tres semanas según las evaluaciones postoperatorias.[115] Sostuvo que este tipo de destello es una complicación reconocida en cirugía de vías respiratorias altas, aunque poco frecuente. Mencionó que su incidencia ha aumentado debido al uso más frecuente del electrocauterio en procedimientos ambulatorios.[116]

Ratificó que para que ocurra fuego en un campo operatorio deben coincidir la presencia de oxígeno y una fuente de ignición como el electrocauterio. Declaró que, en este caso, el escape del tubo endotraqueal permitió la acumulación de oxígeno en el campo quirúrgico, lo cual provocó el destello al usar el cauterio.[117] Respecto al astillamiento del diente número nueve (9), explicó que ocurrió durante la emergencia, al retirar y recolocar el abrebocas para controlar el sangrado y cambiar el tubo, lo cual consideró un riesgo quirúrgico reconocido, especialmente bajo anestesia general, donde el abrebocas puede provocar daño dental al suspender la base de la lengua.[118]

Asimismo, aseguró que, en su opinión, el Dr. Tarrats Ortolaza no se apartó de los estándares médicos en ningún momento.[119] Señaló que, tras el destello, el protocolo fue irrigar la cavidad, colocar paños e inspeccionar la lesión mediante laringoscopía y broncoscopía para confirmar que no hubiera daños adicionales.[120] Finalmente, manifestó que el uso del electrocauterio fue adecuado para controlar el sangrado, ya que era el instrumento más rápido y eficaz en ese contexto, y que el cirujano actuó correctamente conforme a su juicio clínico.[121]

### Dr. Tarrats Ortolaza

El Dr. Tarrats Ortolaza testificó que es médico otorrinolaringólogo con subespecialidad en rinología y cirugía de base de cráneo. Indicó que ejerce actualmente en el Hospital Menonita de Cayey y que también posee privilegios en los hospitales Menonita de Caguas y Centro Médico de Río Piedras.[122] Afirmó que cursó su especialidad en el Recinto de Ciencias Médicas y su subespecialidad

---

[114] *Véase*, Transcripción de la prueba oral, pág. 1360.
[115] *Véase*, Transcripción de la prueba oral, pág. 1361.
[116] *Véase*, Transcripción de la prueba oral, págs. 1361-1362.
[117] *Véase*, Transcripción de la prueba oral, págs. 1373-1374.
[118] *Véase*, Transcripción de la prueba oral, págs. 12381-1382.
[119] *Véase*, Transcripción de la prueba oral, pág. 1382.
[120] *Véase*, Transcripción de la prueba oral, págs. 1382-1383.
[121] *Véase*, Transcripción de la prueba oral, pág. 1383.
[122] *Véase*, Transcripción de la prueba oral, págs. 1506-1507.

en el *Sinus and Nasal Institute* de Florida. Además, declaró haber realizado estudios avanzados en fisiología molecular humana en la Universidad de Yale, medicina pulmonar y cuidados críticos en Johns Hopkins y liderazgo quirúrgico en la Universidad de Harvard[123]. En cuanto a su experiencia, manifestó que para septiembre de 2018 había realizado entre 40 y 60 procedimientos UPP3.[124]

De igual manera, testificó que el 6 de septiembre de 2018 practicó al señor Alvarado Vargas un procedimiento quirúrgico conocido como UPP3, el cual detalló que consta de tres componentes, a saber: (1) una tonsilectomía, (2) una uvulectomía parcial y (3) una faringoplastia mediante el posicionamiento de una sutura en el paladar blando.[125] Expresó que utilizó un retractor Pro Davis, un catéter nasal, una succión continua tipo Yankauer y cauterio bipolar para llevar a cabo la intervención.[126]

Indicó que, una vez culminado el procedimiento, realizó el protocolo recomendado para verificar sangrado postoperatorio, esto es, suspender el retractor y cerrar la boca del paciente. Expreso que, una vez realizado lo anterior, observó una acumulación inmediata de sangre en la orofaringe, lo que interpretó como una manifestación clásica de sangrado activo.[127] Declaró que al reabrir la boca e iniciar succión, observó burbujeo en la sangre, lo que identificó como un escape de aire, lo cual expresó suele ser indicativo de un fallo en el funcionamiento del "cuff" del tubo endotraqueal.[128] Afirmó que notificó verbalmente a su equipo que tenía un escape y que su prioridad inmediata fue evitar una extubación accidental, ya que el señor Alvarado Vargas tenía una vía aérea difícil y podría haber sido imposible reintubarlo.[129]

Relató que intentó controlar el sangrado con un *heliot* mientras se discutía la necesidad de cambiar el tubo endotraqueal. Fue en ese momento, mientras utilizaba el cauterio bipolar para coagular la zona, que afirmó haber observado una chispa, la cual describió como similar a la de un encendedor intentando prenderse.[130] Testificó que gritó la palabra "fuego", aplicó irrigación inmediata con

---

[123] *Véase*, Transcripción de la prueba oral, pág. 1508.
[124] *Véase*, Transcripción de la prueba oral, pág. 1514.
[125] *Véase*, Transcripción de la prueba oral, págs. 1516-1517.
[126] *Véase*, Transcripción de la prueba oral, pág. 1518-1519.
[127] *Véase*, Transcripción de la prueba oral, pág. 1520.
[128] *Véase*, Transcripción de la prueba oral, pág. 1522.
[129] *Véase*, Transcripción de la prueba oral, págs. 1524-1525.
[130] *Véase*, Transcripción de la prueba oral, pág. 1528.

agua y retiró el retractor. Señaló que, aunque nadie más vio el destello, él lo percibió claramente debido a que operaba con lupas de magnificación.[131]

Asimismo, indicó que al bajar el retractor rápidamente, como parte de su respuesta al evento, sospechó que fracturó el diente frontal superior del señor Alvarado Vargas.[132] Declaró que inspeccionó el tubo endotraqueal y observó que la válvula de insuflación estaba cortada. Señaló que, en la primera parte de la cirugía, el "drape" quirúrgico estaba adherido con pegamento sobre el bigote del señor Alvarado Vargas y que, para continuar con la segunda fase, recortó el "drape" con tijera para reposicionarlo. Al hacerlo, manifestó haber cortado accidentalmente el canal de insuflación del tubo, lo cual causó el fallo del "cuff".[133]

Indicó que una vez estabilizó la situación, realizó una laringoscopía directa seguida de una broncoscopía rígida para verificar la condición de la vía aérea del señor Alvarado Vargas. Afirmó que no observó quemaduras internas, aspiración ni obstrucciones. Declaró que las quemaduras visibles en la cavidad oral eran superficiales y que sanaron sin dejar tejido cicatricial.[134]

Al referirse al reporte operatorio, reconoció errores de redacción, particularmente en la oración que establece: "During cauterization of the left pilar an airway fire ensued, endotracheal tube was broke". Expresó que el orden de los eventos fue incorrecto y que el tubo ya estaba dañado antes del evento eléctrico. Aclaró que, aunque podría haberse redactado de manera más precisa, no alteró el documento por tratarse de un registro médico oficial.[135] Afirmó haber estimado la pérdida de sangre en 50 ml, basándose en el volumen anatómico promedio de la orofaringe adulta y en la observación de que el área se llenó dos (2) veces durante la cirugía.[136]

El Dr. Tarrats Ortolaza expresó que, al día siguiente de la operación, llevó al señor Alvarado Vargas a su oficina, ubicada dentro del hospital, con el propósito de realizar un debridaje nasal y una evaluación endoscópica de la vía aérea. Manifestó que la intervención tuvo el fin de aliviar la obstrucción nasal y confirmar

---

[131] *Véase*, Transcripción de la prueba oral, págs. 1528-1530 y 1547.
[132] *Véase*, Transcripción de la prueba oral, pág. 1530.
[133] *Véase*, Transcripción de la prueba oral, pág. 1533-1535.
[134] *Véase*, Transcripción de la prueba oral, págs. 1542-1551 y 1580.
[135] *Véase*, Transcripción de la prueba oral, pág. 1560-1561.
[136] *Véase*, Transcripción de la prueba oral, págs. 1555-1565.

que no hubiese inflamación o colapso de estructuras internas.[137] Expresó que el señor Alvarado Vargas fue dado de alta el 10 de septiembre de 2018 y que lo vio nuevamente el día 11, momento en que observó evidencia de quemaduras en proceso de sanación. [138]

Indicó que el 13 de septiembre de 2018 el señor Alvarado Vargas fue hospitalizado por segunda vez, tras experimentar dolor al tragar y debilidad. Declaró que hubo una sospecha inicial de candidiasis orofaríngea y esofágica, pero que tanto los cultivos como la endoscopía realizados descartaron esa posibilidad. Afirmó que los síntomas observados eran consistentes con los cambios normales posteriores a una cirugía UPPP3. Declaró que el señor Alvarado Vargas fue dado de alta tras recuperar tolerancia a dieta, sin necesidad de sonda nasogástrica.[139]

De igual manera, el Dr. Tarrats Ortolaza testificó que durante todo el proceso mantuvo una relación profesional y respetuosa con el señor Alvarado Vargas y su esposa. Afirmó que se comunicaba directamente con ellos, que atendía sus inquietudes y que recibió múltiples expresiones de agradecimiento por su disponibilidad y atención.[140] Sin embargo, declaró que, durante la visita del 11 de diciembre de 2018, el señor Alvarado Vargas hizo referencia a que lo ocurrido podría costarle, lo que interpretó como una insinuación legal. Ese día, el señor Alvarado Vargas presentó nuevas cotizaciones dentales que incluían tratamientos adicionales no relacionados directamente con el diente fracturado. El Dr. Tarrats Ortolaza señaló que le informó su disposición a considerar el pago, pero sólo tras confirmar los detalles con el dentista encargado de dicho tratamiento.[141]

Finalmente, testificó que el señor Alvarado Vargas manifestó no sentirse cómodo regresando al hospital por razones emocionales. Indicó que, a solicitud del propio señor Alvarado Vargas, lo refirió al Dr. Portela, especialista en rinología. Afirmó que, aunque la relación médico-paciente se dio por concluida, no terminó

---

[137] *Véase*, Transcripción de la prueba oral, pág. 1566.
[138] *Véase*, Transcripción de la prueba oral, págs. 1567-1569.
[139] *Véase*, Transcripción de la prueba oral, págs. 1570-1572.
[140] *Véase*, Transcripción de la prueba oral, págs. 1573-1578.
[141] *Véase*, Transcripción de la prueba oral, págs. 1584-1586.

de forma hostil y que incluso después continuó facilitando el acceso a medicamentos solicitados por medio de su oficina.[142]

### Dr. Jaime Díaz Borges

El Dr. Díaz Borges testificó bajo juramento que es anestesiólogo y que, al momento de los hechos, contaba con veintiún (21) años de experiencia en su campo.[143] Declaró que ha laborado como anestesiólogo en diversos hospitales, incluyendo el Hospital General Menonita de Aibonito, el Manatí Medical Center, el Hospital Ryder y el Centro Médico Menonita de Cayey, donde se desempeñaba además como jefe de sala de operaciones.[144] Afirmó que, para la fecha de la cirugía del señor Alvarado Vargas, ofrecía sus servicios mediante una compañía contratada por el hospital para brindar anestesia.[145]

El Dr. Díaz Borges indicó que el 6 de septiembre de 2018 fue el anestesiólogo encargado de administrar la anestesia al señor Alvarado Vargas y de monitorearlo durante todo el procedimiento quirúrgico.[146] Declaró que el procedimiento consistía en una cirugía endoscópica de los senos paranasales y una palatoplastia, lo cual requería un plan anestésico específico para garantizar la seguridad del señor Alvarado Vargas.[147]

Explicó que, como parte del protocolo habitual, primero se administró una premedicación para reducir la ansiedad del señor Alvarado Vargas, luego se le conectaron los monitores de signos vitales y se le proporcionó oxígeno suplementario.[148] Expresó que, posteriormente, el enfermero anestesista Gabriel Ortiz entubó al señor Alvarado Vargas con un tubo endotraqueal de 7.0 milímetros con "cuff", mientras él supervisaba el proceso y administraba la anestesia.[149] De igual manera, describió detalladamente el tubo endotraqueal y su sistema de "cuff", explicando que este cumple la función de asegurar el tubo, crear un sello hermético en la tráquea y prevenir fugas de aire o la aspiración de fluidos.[150]

---

[142] *Véase*, Transcripción de la prueba oral, págs. 1587-1591.
[143] *Véase*, Transcripción de la prueba oral, pág. 1695.
[144] *Véase*, Transcripción de la prueba oral, págs. 1695-1696.
[145] *Véase*, Transcripción de la prueba oral, pág. 1697.
[146] *Véase*, Transcripción de la prueba oral, pág. 1697.
[147] *Véase*, Transcripción de la prueba oral, pág. 1699.
[148] *Véase*, Transcripción de la prueba oral, págs. 1700-1702.
[149] *Véase*, Transcripción de la prueba oral, págs. 1705-1707.
[150] *Véase*, Transcripción de la prueba oral, págs. 1707-1709.

Aclaró que el globo del "cuff" se ubicó por debajo de las cuerdas vocales, fuera del campo quirúrgico.[151]

El Dr. Díaz Borges declaró que, tras verificar que todo estaba en orden y que el señor Alvarado Vargas estaba adecuadamente ventilado, entregó el control al anestesista bajo su supervisión y salió a atender otros pacientes, como parte del modelo habitual de supervisión anestésica.[152] Expresó que más tarde recibió un llamado urgente informándole que había un problema con el tubo endotraqueal durante la cirugía.[153] Afirmó que, según la nota del enfermero anestesista encargado, el Dr. Tarrats Ortolaza le había informado que accidentalmente cortó el tubo endotraqueal al introducir un instrumento quirúrgico.[154] Declaró que, tras recibir el aviso, se dirigió inmediatamente a sala de operaciones y llegó alrededor de las 11:45 a.m., según la evidencia del récord de anestesia.[155] Indicó que, al llegar, ordenó detener la cirugía y apagar el oxígeno, aunque ya el oxígeno había sido desconectado y el anestesista estaba ventilando manualmente al señor Alvarado Vargas con éxito.[156] Declaró que consideró la situación como una urgencia, pero no una emergencia inmediata, ya que el señor Alvarado Vargas se encontraba estable.[157]

Asimismo, explicó que, ante la situación, decidió tratarla como una vía aérea difícil y fue a buscar un instrumento llamado "bougie" para facilitar el cambio seguro del tubo.[158] Afirmó que el reemplazo del tubo endotraqueal se realizó sin complicaciones y que luego el Dr. Tarrats Ortolaza procedió a evaluar los posibles daños en la cavidad oral y la vía aérea del señor Alvarado Vargas.[159] Declaró que, según el récord, el oxígeno fue apagado antes de las 11:45 a.m., y que el fuego ocurrió después, alrededor de las 11:47 a.m.[160] Expresó que, aunque el oxígeno estaba apagado, el monitor aún mostraba un alto porcentaje de oxígeno inspirado debido a un flujo mínimo residual que las máquinas de anestesia mantienen como medida de seguridad. Asimismo, indicó que la saturación del

---

[151] *Véase*, Transcripción de la prueba oral, pág. 1710.
[152] *Véase*, Transcripción de la prueba oral, págs.1711-1712.
[153] *Véase*, Transcripción de la prueba oral, pág. 1714.
[154] *Véase*, Transcripción de la prueba oral, pág. 1715.
[155] *Véase*, Transcripción de la prueba oral, págs. 1721-1722.
[156] *Véase*, Transcripción de la prueba oral, págs.1722-1723.
[157] *Véase*, Transcripción de la prueba oral, pág. 1724.
[158] *Véase*, Transcripción de la prueba oral, pág. 1726.
[159] *Véase*, Transcripción de la prueba oral, pág. 1728.
[160] *Véase*, Transcripción de la prueba oral, págs. 1728-1729.

señor Alvarado Vargas permaneció en 99% durante el incidente, explicando que, al haberse administrado previamente oxígeno al 100%, los pulmones del señor Alvarado Vargas podían mantener la oxigenación adecuada durante varios minutos.[161]

El Dr. Díaz Borges testificó que, tras el evento, el tubo endotraqueal removido no mostraba señales de quemaduras, aclarando que, en un incendio real de vía aérea, el tubo se derretiría, lo cual no ocurrió en este caso.[162] Declaró que conocía el protocolo de prevención de incendios del hospital y que, según su percepción, dicho protocolo fue cumplido adecuadamente, ya que se detuvo el procedimiento, se apagó el oxígeno y se cambió el tubo de manera segura.[163] Finalmente, afirmó que el daño en el tubo ocurrió en la línea del "cuff" y que su prioridad fue siempre asegurar la vía aérea del señor Alvarado Vargas antes de evaluar la causa del escape de aire.[164] Aclaró que el cambio del tubo se realizó de forma oportuna y segura, considerando todos los riesgos del caso.[165]

### Dr. Juan Portela Arraiza

El Dr. Portela Arraiza testificó que es médico otorrinolaringólogo, especializado en el área de nariz, garganta y oídos, y que ejerce la profesión desde el año 2002.[166] Afirmó que ofrece sus servicios médicos en la región de Manatí y que cuenta con una práctica activa en esa área.[167] Declaró que el señor Alvarado Vargas le fue referido por el Dr. Tarrats Ortolaza para evaluación médica, a raíz de una cirugía previa a la que había sido sometido.[168]

Expresó que atendió por primera al señor Alvarado Vargas vez el 25 de enero de 2019, cuando este acudió a su oficina para consulta.[169] Indicó que, como parte de la rutina médica, el señor completó un historial médico donde no reportó condiciones psiquiátricas ni otros problemas médicos relevantes fuera de los síntomas que motivaron la consulta.[170] Afirmó que, durante esa primera visita, el señor Alvarado Vargas le expresó que padecía de ronquidos y congestión nasal,

---

[161] *Véase*, Transcripción de la prueba oral, págs. 1730-1732.
[162] *Véase*, Transcripción de la prueba oral, págs. 1732-1733.
[163] *Véase*, Transcripción de la prueba oral, págs. 1734-1736.
[164] *Véase*, Transcripción de la prueba oral, págs. 1737-1738.
[165] *Véase*, Transcripción de la prueba oral, págs.1738-1739.
[166] *Véase*, Transcripción de la prueba oral, págs. 1847-1848.
[167] *Véase*, Transcripción de la prueba oral, pág. 1848.
[168] *Véase*, Transcripción de la prueba oral, págs. 1848-1854.
[169] *Véase*, Transcripción de la prueba oral, págs. 1854-1855.
[170] *Véase*, Transcripción de la prueba oral, pág. 1855.

síntomas que ya habían sido tratados previamente mediante una cirugía.[171] Afirmó que su función en la consulta fue evaluar el estado actual del señor Alvarado Vargas, luego de dicha cirugía, y brindar su opinión médica sobre la condición nasal y respiratoria del señor Alvarado Vargas.[172]

En línea con lo anterior, expresó que el señor Alvarado Vargas manifestó preocupación sobre la efectividad del procedimiento quirúrgico al cual había sido sometido y también sobre su proceso de recuperación. Indicó que durante sus evaluaciones no observó complicaciones graves ni hallazgos que requirieran una intervención de emergencia en ese momento.[173] Específicamente, señaló que no tenía ninguna anormalidad, la lengua se veía de buen color y buena movilidad y en posición media y que la orofaringe revelaba que existía una cicatriz consistente con el procedimiento que le fue realizado por el Dr. Tarrats Ortolaza. [174]

Resumida la prueba testifical que tuvo ante sí el juzgador de los hechos, pasemos a evaluarla a la luz del derecho aplicable.

El Apelante argumenta que el Dr. Ortiz Feliciano, quien no es especialista en otorrinolaringología, no presentó en su informe pericial ni en su testimonio las normas o estándares médicos que rigen la práctica de un otorrinolaringólogo, especialista en rinología y cirugía de la base del cráneo, en procedimientos como la uvulopalatofaringoplastia (UPP3). Sostiene, además, que el Dr. Ortiz Feliciano tampoco demostró que el Dr. Tarrats Ortolaza haya incumplido con dichas normas o que su conducta haya sido la causa de los daños reclamados. Asimismo, plantea que el TPI cometió un error al no darle el peso probatorio a los testimonios del Dr. Tarrats Ortolaza y del Dr. Juarbe Santos, ambos especialistas en otorrinolaringología.

Conforme adelantáramos en los acápites anteriores, los tribunales apelativos no podemos sustituir la apreciación de la prueba ni la adjudicación de credibilidad otorgada por el Tribunal de Primera Instancia, salvo que medie error manifiesto, prejuicio, parcialidad o pasión. Ortiz Ortiz v. Medtronic, *supra*, pág. 779; Dávila Nieves v. Meléndez Marín, *supra*, págs. 771-772. Lo anterior responde

---

[171] *Véase*, Transcripción de la prueba oral, pág. 1856.
[172] *Véase*, Transcripción de la prueba oral, pág. 1856.
[173] *Véase*, Transcripción de la prueba oral, pág. 1858.
[174] *Véase*, Transcripción de la prueba oral, pág. 1859.

a que el foro primario es quien escucha y observa directamente a los testigos. Por consiguiente, sólo procede la revisión si la decisión es claramente errónea o carece de base suficiente. Gómez Márquez *et al.* v. El Oriental, *supra,* pag. 794.

Por su parte, un perito es aquella persona que, mediante su educación, experiencia, destrezas o adiestramiento, posee el conocimiento necesario para ayudar al tribunal en la comprensión de asuntos técnicos o especializados. McNeil Healthcare v. Mun. Las Piedras II, *supra*, pag. 677; San Lorenzo Trad., Inc. v. Hernández, *supra*, pág. 709.  Sin embargo, no es necesario que el perito tenga una especialidad médica en particular, pues lo importante es que esté capacitado para asistir al juzgador en la controversia. La ausencia de cierta especialidad puede afectar el peso del testimonio, pero no su admisibilidad. Cruz Flores *et al.* v. Hosp. Ryder *et al.*, *supra*, págs. 494-495; Dye-Tex P.R., Inc. v. Royal Ins. Co., *supra*, págs. 664-665.

Luego de evaluar el expediente ante nuestra consideración, con especial atención a la TPO de los testimonios vertidos en el juicio, estamos convencido de que el TPI actuó correctamente al declarar "Ha Lugar" la "**Demanda**" incoada en contra del Dr. Tarrats Ortolaza. Nos explicamos.

En el presente caso, el señor Alvarado Vargas fue sometido a una cirugía por el Dr. Tarrats Ortolaza con el fin de atender su condición de sinusitis y apnea del sueño. La prueba presentada en el juicio demostró, de forma clara, que el Apelado sufrió daños como resultado directo de la intervención del Dr. Tarrats Ortolaza. En específico, sufrió quemaduras de segundo grado en la lengua, el paladar y los labios, además de la fractura de un diente que posteriormente requirió que recibiera tratamiento en sus cuatro dientes frontales. A raíz de estos daños, estuvo hospitalizado en intensivo en dos ocasiones incluyendo cinco (5) días bajo cuidado intensivo, mantuvo una dieta líquida durante diez días, perdió 25 libras y fue diagnosticado con trastorno de estrés postraumático y depresión mayor recurrente severa.

El Dr. Ortiz Feliciano, quien fue admitido como perito por el TPI y a quien dicho foro le dio valor probatorio y le mereció credibilidad su testimonio, declaró bajo juramento que los daños sufridos por el señor Alvarado Vargas fueron consecuencia de actuaciones negligentes atribuibles al Dr. Tarrats Ortolaza. Es

menester recalcar que no era necesario que el referido perito contara con una especialidad en otorrinolaringología para ilustrar al Tribunal sobre los asuntos médicos en controversia, pues el foro *a quo* evaluó su preparación y concluyó que estaba debidamente capacitado para testificar, conforme a los principios reconocidos por nuestro Tribunal Supremo respecto a la admisión de prueba pericial. En vista de ello, entendemos que dicho foro no incurrió en error manifiesto, ni actuó con prejuicio, parcialidad o pasión al así determinarlo.

En particular, el Dr. Ortiz Feliciano testificó que el incendio ocurrido durante la cirugía fue un evento médico prevenible. Declaró que el fuego se produjo por la combinación de tres factores presentes en la sala: (1) un oxidante, que identificó como el oxígeno; (2) una fuente de ignición, que indicó fue el electrocauterio, cuyo calor "es controlado por el cirujano"; y (3) un material combustible, que señaló fue el tubo endotraqueal.[175] Indicó que el Dr. Tarrats informó que rompió el canal de insuflación del tubo endotraqueal, lo que provocó una fuga de oxígeno en el campo quirúrgico.[176] Asimismo, explicó que, según el récord médico, el oxígeno se apagó a las 11:45 a.m., pero el fuego se observó a las 11:47 a.m., mientras persistía la fuga y el cirujano utilizaba el electrocauterio.[177] Añadió que, en su opinión, al momento en que se rompió el tubo era necesario reducir de inmediato el oxígeno para evitar un ambiente propenso a incendios.[178]

En línea con lo anterior, de su informe pericial se desprende, entre otras cosas, lo siguiente:

> Case History
> 51y/o male with history of chronic sinusitis, obstructive sleep apnea and septum deviation. Patient was admitted on 9/6/2018 for Endoscopic Sinus Surgery and palatoplasty by Dr. Tarrats. During cauterization of the left pilar an airway fire ensured with significant injuries on tonge, lip, hard plate and left frontal ncisor. Wire was immediately controlled when oxygen air supply was discontinued and oropharynx immersed in saline. The airway was evaluated by direct larygoscopy and bronchoscopy and was found to be intact. Patient was extubated and sent to critical care for management. He was discharged on 9/10/2018 on Medrol and Doxycycline and Doxycycline.
>
> Patient was readmitted on 9/13/2018 complaining that he could not swallow meals, nor liquids. He had candida tomatitis, candida esophagitis and moderate dehydration. Was started on Zozyn and Diflucan therapy responding well. Upper endoscopy

---

[175] *Véase*, Transcripción de la prueba oral, pág. 731.
[176] Íd.
[177] *Véase*, Transcripción de la prueba oral, pág. 732.
[178] *Véase*, Transcripción de la prueba oral, pág. 748.

> performed on 9/18/2018 revealed erosive gastroenteritis, tongue and cheek have mucosaliced. Responded to therapy and was discharged on 9/24/2018 with appointment for follow-upr with Dr. Tarrats.[179]
>
> […]
>
> Dr. Tarrats punctured the ETT tube permitting leakage and creation of an oxygen rich surgical field which increased the risk of combustion.
> Dr. Tarrats failed to decrease the concentration of oxygen by suction scavenging around the surgical field.
> Dr. Tarrats failed to stop the operation immediately and performed electrocautery to the left pilar which acted as an ignition source.[180]

En este sentido, concordamos con el TPI respecto a que el Dr. Tarrats Ortolaza fue negligente al cortar la línea de inflación del "cuff" que mantenía presurizada el área donde se ubicaba el tubo endotraqueal para la aplicación de anestesia. Tal proceder provocó un ambiente quirúrgico peligrosamente expuesto al oxígeno, lo cual culminó en el fuego que ocasionó las lesiones al señor Alvarado Vargas. Resulta innegable que su conducta representó una desviación del deber de cuidado exigido a un médico en esas circunstancias y así lo estableció contundentemente la prueba que tuvo ante sí el TPI.

La prueba pericial presentada y creída por el foro *a quo* demostró que el Dr. Tarrats Ortolaza no actuó conforme al nivel de cuidado exigido en este tipo de procedimiento quirúrgico. El deber de cuidado le imponía evitar, mediante una manipulación precisa y diligente, cortar o dañar la línea de inflación del *cuff* del tubo endotraqueal, componente esencial para mantener la presión y prevenir fugas de oxígeno durante la mencionada cirugía. Sin embargo, quedó probado que el Dr. Tarrats Ortolaza incumplió con esta obligación básica al cortar dicho *cuff*, provocando una fuga de oxígeno que generó un campo quirúrgico propenso a la combustión. Además, una vez ocurrió la fuga, el nivel de cuidado exigía identificarla de inmediato, suspender la cirugía, reducir la concentración de oxígeno en el área y abstenerse de utilizar el electrocauterio mientras existiera ese riesgo. El Dr. Tarrats Ortolaza tampoco observó estas medidas de seguridad, y su omisión resultó ser la causa directa de las lesiones sufridas por el señor Alvarado Vargas, las cuales, según la prueba le ocasionaron serias angustias y sufrimientos mentales a éste y su familia cercana. Habiéndose acreditado el incumplimiento del deber de cuidado y el nexo causal con el daño, queda

---

[179] *Véase*, Apéndice del Recurso de Apelación, pág. 1296.
[180] *Véase*, Transcripción de la prueba oral, pág. 1298.

plenamente establecida la responsabilidad civil por impericia médica en el presente caso.

Por último, el planteamiento de que se dictó sentencia bajo una doctrina inaplicable en nuestra jurisdicción, conocida como *res ipsa loquitur*, es totalmente improcedente. Dicha doctrina implica que, en ciertos casos, la negligencia puede presumirse automáticamente a base de la mera ocurrencia del accidente, sin necesidad de prueba directa, invirtiendo la carga de la prueba contra el demandado. Sin embargo, esta figura fue eliminada de nuestro ordenamiento jurídico en Admor, F.S.E. v. Almacén Ramón Rosa, *supra*, donde nuestro máximo foro judicial dejó claro que las controversias sobre daños y perjuicios deben resolverse conforme a nuestro derecho civil y probatorio, sin acudir a presunciones automáticas.

Como puede observarse, ese no es el escenario de la controversia ante nuestra consideración. Aquí no se acudió a presunciones, sino que se presentó prueba clara, robusta y contundente que demostró, palmariamente, que el señor Alvarado Vargas sufrió daños severos como consecuencia directa del acto negligente del Dr. Tarrats Ortolaza al cortar el "cuff" del tubo endotraqueal. Esto es, la determinación del foro *a quo* se basó en evidencia concreta y en inferencias razonables sustentadas en hechos probados, conforme a las normas vigentes de evidencia y de responsabilidad civil extracontractual en nuestra jurisdicción.

Ante la claridad, robustez y precisión de la prueba en lo que, al aspecto de negligencia se refiere, no hallamos ni un ápice de indicador que nos conduzca a la conclusión de que el TPI se equivocó al aquilatar la evidencia que tuvo ante sí y colegir que el Dr. Tarrats Ortolaza fue negligente. Basados en lo anterior, y en el escenario probatorio que tenemos ante nos, entendemos procedente imponerle el pago de sanciones económicas al Apelante. Ello pues, la insistencia y el proceder de éste han obligado a los Apelados a asumir innecesariamente las molestias, gastos e inconvenientes que supone este tipo de trámite apelativo. Esto al margen de tener que revivir los daños psicológicos sufridos que probaron ante el foro de instancia. Debido a ello, y al amparo de la Regla 85 de nuestro Reglamento, *supra*, ordenamos al Apelante a pagar a la parte apelada la cantidad

de mil quinientos dólares ($1,500.00), en concepto de honorarios de abogados en apelación dentro del término de diez (10) días de notificado el presente dictamen.

**IV.**

Por los fundamentos que anteceden, los cuales hacemos formar parte integral del presente dictamen, se *confirma* la *Sentencia* apelada.

Además, se le ordena al Dr. Luis A. Tarrats Ortolaza a remitir a los Apelados, de manera conjunta, la cantidad de **mil quinientos dólares ($1,500.00)** en concepto de honorarios de abogados en apelación dentro de los próximos **diez (10) días** de notificada esta determinación. Una vez realizado el referido pago, el Apelante deberá acreditar a esta Curia el cumplimiento con el mismo. La sanción económica impuesta en esta decisión debe considerarse independiente de la establecida por el foro primario en el dictamen apelado.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones